768 P.2d 1302

**AIRSTREAM, INC.,**
**Plaintiff-Respondent.**

v.

**CIT FINANCIAL SERVICES, INC.,**
**Defendant-Appellant.**

No. 16857.

Supreme Court of Idaho.

Dec. 20, 1988.

Clemons, Cosho & Humphrey, Boise, for defendant-appellant. David M. Penny argued.

Moffatt, Thomas, Barrett & Blanton, Boise, for plaintiff-respondent. Phillip S. Oberrecht argued.

BISTLINE, Judge.

Most of the facts giving rise to this controversy are well set out in *Airstream, Inc. v. CIT Financial Services, Inc.*, 111 Idaho 307, 723 P.2d 851 (1986) (*Airstream I*), which reversed a district court judgment in favor of Airstream, and remanded for a finding to ascertain CIT's intent in the endorsement by one of its clerical employees (Kristin Haustveit) of a check delivered to it by the Boise Airstream dealer (Shuler), and also for findings relating to the usages of the trade and course of dealings be-

tween Airstream and Shuler. *Airstream I,* 111 Idaho at 313, 723 P.2d at 857. Following remittitur the parties provided the district court with additional briefing, oral argument, proposed findings and objections thereto. No additional testimony was taken and no additional exhibits were introduced at a district court hearing whereat counsel for both parties were fully heard from and engaged the Court in a lengthy colloquy. Thereafter the trial court's decision was to enter new findings and conclusions as directed. Judgment was again entered in favor of Airstream, and CIT again appealed.

## I.

### LACK OF EVIDENCE TO SUSTAIN THE COURT'S CONCLUSION OF CIT'S LIABILITY AS AN ACCOMMODATION PARTY

No additional evidence having been heard or offered by either party, we find ourselves hard-pressed to find, in the identical evidentiary record which was previously before us, any evidence to sustain the supplemental finding that CIT's intent in endorsing the Shuler check was to do so as an accommodation party. Where the parties plaintiff and defendant had no further evidence to introduce on the issues of Kristin Haustveit's intent in stamping CIT and signing her name as an apparent endorsement on the Kirk Shuler checks made out to Airstream, it is self-evident that the record in that respect is no more informative now than it was when we made out first review in *Airstream I.* There our unanimous opinion cited to the Pierstorff Rule, for the thoroughly entrenched proposition:

> ... that courts must accept as true the positive uncontradicted testimony of credible witnesses, unless inherently improbable or rendered so by facts and circumstances disclosed at the trial. *Curtis v. DeAtley,* 104 Idaho 787, 663 P.2d 1089 (1983); *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979); *Pier-*storff *v. Gray's Auto Shop,* 58 Idaho 438, 74 P.2d 171 (1937).

*Airstream I,* 111 Idaho at 312, 723 P.2d at 856.

Our opinion in that case pointed to the testimony of John Buzan which was relative to the check endorsement issue. Discussing *only pre-sold units,* Justice Bakes noted Buzan's testimony that pre-sold trailers:

> ... were generally paid for either with dealers' checks made payable solely to the manufacturer or by checks payable jointly to CIT and the manufacturer, in which case CIT would merely endorse the check and forward it to the manufacturer. He stated that he believed the dealers made some checks payable to both CIT and the manufacturer in order to keep their records straight. He also stated that CIT never endorsed such checks with the intent of guaranteeing payment on the check.

*Airstream I, supra,* at 310, 723 P.2d at 854. The testimony of Kristin Haustveit relative to the endorsement was also summed up:

> Kristin Haustveit was also employed by the Boise office of CIT at the time of these transactions. Kristin admitted that she had stamped the CIT endorsement on the back of the checks. Although she did not recall the specific of either transaction, she testified that it was her signature which appeared under the CIT endorsement. She testified that she believed the endorsement was a clerical error since she could not recall ever being instructed to place CIT's endorsement on any check on which CIT was not listed as a payee. She stated that she only had authority to place CIT's endorsement on dealers' checks which were made out to both CIT and the manufacturer before transmitting the check to the manufacturer.

*Airstream I, supra,* at 310, 723 P.2d at 854.

Carl Ramga was the Airstream executive in charge of accounts receivable. The fol-

lowing is the summation of his testimony as reported in *Airstream I:*

Finally, Carl Ramga, Sharon's Airstream supervisor at the time of the transactions, testified that Airstream's standard operating procedure was to get a verbal commitment for financing before shipping a unit to a dealer. He identified the Airstream invoices sent to CIT as floor plan billings. *He stated that while it was unusual to receive Wheels Unlimited's check rather than CIT's check in a floored transaction, he recalled seeing CIT's endorsement on the back of the check and had assumed the endorsement made CIT a party to the transaction.* Ramga testified that he had never received a dealer's check made out to both Airstream and a finance company. Ramga also testified that he had not seen the CIT confirmations which Buzan testified that he mailed to Airstream which contained the notations 'pre-sold' and 'not to be floored.'

*Airstream I, supra,* at 311, 723 P.2d at 855 (emphasis added).

The district court in its second review of the evidence in making a new set of Amended Findings and Conclusions of Law After Remand, made the following findings on the check endorsement issue:

13. After the delivery of the two travel trailers to Wheels Unlimited, Kirk Shuler drew two checks to the order of Airstream in the amounts of $15,704.84 and $21,961.50.

14. Prior to deliver of these checks, CIT, by and through its agent, Kristin Haustveit, placed its endorsement in blank on the reverse of the checks.

15. When Kristin Haustveit placed the CIT endorsement in blank on the reverse of the checks, *CIT intended that the checks would pay Airstream for the units purchased by CIT from Airstream for* delivery to Wheels Unlimited and that CIT intended to lend its credit to the Wheels unlimited checks in payment of CIT's obligations to Airstream. The Court is not persuaded that Kristin Haustveit's placement of the CIT endorsement in blank on the reverse of the checks was by mistake.

16. On or about June 4, 1979, Airstream presented the checks to the Idaho First National Bank, West State Office, Boise, Idaho, for payment and acceptance. Payment was demanded but was refused by the bank and the checks were dishonored. Timely notice of dishonor was given to CIT on or about June 19, 1979, and again on or about August 1, 1980.

(Emphasis supplied). It is to be noted that the district court did not find that the testimony of Kristin Haustveit and John Buzan was in any way contradicted; the court did not find that the testimony of either witness was incredible. Neither witness was then in the employ of CIT, and both in fact had held other employment for a number of years. The district court made no mention of the Pierstorff Rule, and no attempt was made to explain away the nonapplication of the rule. The court said only that "the court is not persuaded that Kristin Haustveit's placement of the CIT endorsement in blank on the reverse of the checks was by mistake." The court did not make a direct evidentiary-based finding as to CIT's intent in endorsing the Shuler checks. The court as a conclusion of law stated only this: "CIT became an accommodation party to the two checks issued by Kirk Shuler. Idaho Code § 28–3–415."

Fatally missing is any finding of fact to sustain that conclusion. For the court to say as it did that it was not persuaded that the endorsing of the checks was a clerical mistake does not amount to a finding that the testimony of both Kristin Haustveit and John Buzan was incredible and not worthy of belief. Both were apparently uninvolved and disinterested witnesses. The Pierstorff Rule as quoted in *Dinneen, supra,* teaches in part that: "neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes

known to the law, if such testimony does not exceed probability." *Dinneen*, 100 Idaho at 627, 603 P.2d at 582. A second part of the Pierstorff Rule found also in *Dinneen* at the pages cited, but more importantly found also in *Airstream I* is that,

Such uncontradicted testimony may only be disregarded if the testimony's falsity is apparent 'without any resort to inferences or deductions,' *Curtis v. DeAtley, supra*, 104 Idaho at 790, 663 P.2d at 1092, *quoting Dinneen v. Finch*, 100 Idaho 620, 627, 603 P.2d 575, 582 (1979).

*Airstream I*, 111 Idaho at 312, 723 P.2d at 856.

On the evidentiary record before it, the trial court could not disregard the testimony of the witnesses Haustveit and Buzan. Moreover the trial court did not consider, and hence disregarded, the testimony of Airstream's Mr. Ramga as recounted in *Airstream I*, "Ramga testified that he had never received a dealers' check made out to both Airstream and a finance company." *Airstream I, supra*, at 311, 723 P.2d at 855. Also, Ramga stated that "he recalled seeing CIT's endorsement on the back of the check and had assumed the endorsement made CIT a party to the transaction." *Id.*, at 311, 723 P.2d at 855.

Not mentioned in *Airstream I*, but brought to the trial court's attention was Mr. Ramga's obvious difficulty in explaining why he pursued Shuler rather than CIT when the two Wheels Unlimited checks bounced:

Q. You indicated a moment ago that you expected to receive a payment from C.I.T. on these two units.

A. These two.

Q. Why is it then you called Shuler when the check did not clear rather than calling C.I.T.?

A. He signed the check. He was the maker on it.

Q. A moment ago, though, you said C.I.T. had stamped on the back and so they were a party, also.

A. That's true.

Q. Is there a reason you didn't notify them that the check had not cleared?

A. No. I honestly felt that Kirk could make it good.

Q. So, you went directly to him?

A. I went directly to him.

Q. *Why would he make the check good if it was a plain and simple flooring arrangement is what I don't understand.*

A. Well, I presume he's a reputable businessman he would want to make his check good.

Q. My question was: *Why would he want to make the checks good or why would you look to him for payment if it was a flooring?*

A. Well, I'm not sure I can answer that. I can't think for him. I mean, *all I'm saying is that his name was on the check,* so I called him.

Q. But from Airstream's standpoint, if there was a flooring, then the financing institution would pay you?

A. That's correct.

Q. But in this case, you made no attempt to contact the financing institution, C.I.T., about payment for these two units?

A. Not immediately, no.

That testimony has to be considered in conjunction with his earlier affidavit wherein he presented the appearance of being well-versed where accommodation endorsements are concerned.

Mr. Ramga's affidavit executed in Ohio on August 18, 1981, just two years after the transaction stated this:

During the year 1979, I was the comptroller and national credit manager of Airstream, Inc. In that capacity, I was in charge of payment and credit arrangements between Airstream, its dealers and its dealers' financing institutions. I am familiar with the Airstream policies regarding such arrangements and I am also familiar with arrangements Airstream, Inc. had with Kirk Shuler's Wheels Unlimited and its financing institution, CIT Financial Services, Inc.

During the year 1979, Airstream, Inc. manufactured and sold travel trailers to dealers throughout the United States. Airstream took payment for trailers it delivered to its dealers under two specific types of arrangements:

1. C.O.D.—Airstream would ship the trailer along with the manufacturer's statement of origin and the invoice directly to the dealer, and the driver of the delivery vehicle would exchange the trailer and documents for payment made directly by the dealer; and

2. *Floor Plan Financing*—Airstream would ship the trailer directly to the dealer and send a designated floor plan financing institution the manufacturer's statement of origin and invoice, *and the floor plan institution would make payment directly to Airstream once it had confirmed that the trailer had been delivered.*

\*     \*     \*     \*     \*     \*

With respect to the two trailers involved in this action, I have reviewed the business records of Airstream, Inc. on several occasions and found no deviation from standard policy. I have concluded *the two trailers were sold by Airstream to Kirk Shuler's Wheels Unlimited on the basis of a floor plan approval by CIT Financial Services,* who guaranteed payment to Airstream. *Payment for the two trailers was received by Airstream from CIT Financial Services, by two checks drawn by Kirk Shuler's Wheels Unlimited to the order of Airstream, Inc.* CIT Financial Services chose to make payment to Airstream by transmitting those checks to Airstream with an accommodation endorsement of CIT Financial Services on the reverse sides of those checks.

The second sentence of the two emphasized passages is inconsistent with the prior sentence that where the transaction was floor-planned, the financing institution (here CIT) *would make payment directly to Airstream once it had confirmed that the trailer had been delivered.* The gist of the Ramga explanation is: CIT had floor-planned the two trailers for Shuler, and on delivery owed the purchase price on both units to Airstream. Then, well over a month later (as compared to on delivery to the dealer), CIT chose *not* to do the ordinary thing, *i.e.,* mail checks to Airstream, but instead made the choice of having Shuler issue two checks to Airstream and bring them to CIT for an endorsement which if not otherwise explained would make CIT liable, and thus in that cumbersome manner CIT would (belatedly, and despite a record to the contrary), pay for trailers which Airstream supposedly had sold to Shuler under a floor-planning agreement.

Mr. Ramga, two years later at his deposition would answer, "No" when asked, "Prior to these two N.S.F. checks, had you ever had any problems with C.I.T. paying you for any units they agreed to floor?" He also experienced difficulty when inquiry was made relative to the delay in not receiving any payment from CIT:

Q. Normally, do you have any procedure that after you shipped a unit, did you look for payment? In other words, do you have some calendaring device where you'll follow up to see where your money is?

A. Seven days normally.

Q. And what do you do at the end of seven days?

A. Call.

Q. Call whom?

A. Whoever agreed to pay for it.

Q. So, in the normal course of events, in this case, you'd expect that unit to have arrived about April 3rd or 4th?

A. Right. We would have expected payment then on or around the 10th of April.

Q. And you would have called somebody to check on payment?

A. I can't say that a call was made. *Normally, we did.*

Q. Was that a procedure you followed?

A. Yes, but I can't—like I say, *I'm not sure that the call was made.*

John Buzan was clear and unequivocating that there was not any call from Airstream:

A. These particular units, by the way, were never followed up to the factory. The factory was well aware that they were presold. *If they ever called up* to see where the $30,000 was, *they knew that the dealer was paying.* They never once asked us for payment. There was a thirty-day delay. They never once inquired for CIT for payment, for collection, anything.

Q. You say there was a thirty-day delay between what?

A. Generally? Our standard policy?

Q. No, just on these two units, the delay?

A. Between the date that it was approved and/or shipped I don't know what date they were shipped and the date that they receive the money.

Q. The two checks that are marked and you looked at a moment ago?

A. I didn't look at them. From my recollection there was at least a thirty-day span.

Q. It's Exhb. No. 3.

A. May 7, they are both written on May 7, right? This one was approved on April 5, so this is 32 working days and $22,000 was outstanding. This one was approved on March 30 to May 5 so there is 35 days that these, whatever this is 15,000 were outstanding. We were never contacted to my knowledge by the factory wondering where the money is.

Accordingly, on the same evidentiary record which was before us on the first appeal we are convinced that the trial court erred in holding CIT liable as an accommodation endorser.

## II.

### THE TRIAL COURT'S CONCLUSION OF CIT'S LIABILITY AS A CONTRACT PURCHASER IS NOT SUSTAINED

■ Similarly, on that same evidentiary record which was before us on our prior

review, we are unable to find anything which sustains the trial court's finding that Airstream sold the two trailers to CIT, which corporation in turn sold them to Shuler.[1]

■ Moreover, this latter finding is in direct conflict with this Court's analysis of that relationship which was made on the same written record in *Airstream I:*

While admittedly the transaction between Airstream and Wheels Unlimited was an Article 2 sales transaction, *CIT was not purchasing recreational vehicles from Airstream,* and was not a "merchant" dealing in goods of the kind sold by Airstream. CIT was only a financing institution which had a contractual arrangement with Wheels Unlimited to Finance its inventory of recreational vehicles.

*Airstream, Inc. v. CIT Financial Services, Inc.,* 111 Idaho 307, 311, 723 P.2d 851, 855 (1986) (emphasis added).

In the spring of 1979 *Shuler purchased two pre-sold travel trailers from Airstream,* the first of these trailers for $15,704.84, the second for $21,711.50. Ultimately Airstream received two checks drawn by Shuler, as payment for the trailers which also contained CIT's endorsement in blank on the back. When Airstream presented the checks to Idaho first National Bank for payment, the checks were dishonored. Subsequently, Airstream contacted CIT to demand that CIT turn over the checks pursuant to its endorsement. CIT refused, claiming that the trailers had not been purchased under the flooring plan and that the company's endorsement on the checks was the result of clerical error.

*Airstream I, supra,* at 308, 723 P.2d at 852 (emphasis added).

1. Amended Finding No. 5 reads:

5. On or about March 30, 1979, Airstream entered into an agreement with CIT *to sell to CIT,* under the same type of floor plan arrangement which had been in place between Airstream and CIT through a continued course of dealings over several years, an Air-

stream International Sovereign Travel Trailer; Serial No. I31A9J2631, with delivery of said travel trailer being made to Wheels Unlimited in return for CIT paying to Airstream $15,-704.84. (Emphasis added.)

Finding No. 6 is identical, other than for the description of the travel trailer.

In thus attempting to carry out this Court's mandate on remand, the district court has made a finding which flies in the face of this Court's 1986 decision, and is barred by the law of the case doctrine which:

> [H]as long been the rule in this jurisdiction. *See, e.g., Kerns v. Morgan,* 11 Idaho 572, 83 P. 954 (1905); *Unfried v. Libert,* 23 Idaho 603, 131 P. 660 (1913); *Richards v. Jarvis,* 44 Idaho 403, 258 P. 370 (1927); *Creem v. Northwestern Mutual Fire Ass'n of Seattle, Washington,* 58 Idaho 349, 74 P.2d 702 (1938).

*Suitts v. First Security Bank of Idaho,* 110 Idaho 15, 23, 713 P.2d 1374, 1382 (1985). The Court in a *per curiam* opinion in the following year cited *Suitts* for the same proposition, *i.e.,* "the doctrine of law of the case has long been the rule in this jurisdiction." *Matter of Barker,* 110 Idaho 871, 872, 719 P.2d 1131, 1132 (1986).

### III.

### AN INDEPENDENT REVIEW

In the *Barker* case the Courts *per curiam* opinion provided a succinct explanation of the law of the case doctrine:

> The rule is well established and long adhered to in this state that where, upon an appeal, the Supreme Court, in deciding a case presented states in its opinion a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal.... *Suitts v. First Security Bank of Idaho,* 110 Idaho 15, 713 P.2d 1374 (1985) (*quoting from Carlson v. Northern Pacific Rail Co.,* 86 Mont. 78, 281 P. 913, 914 (Mont.1929).

*Barker, supra,* 110 Idaho at 872, 719 P.2d at 1132. Much of what was written in *Airstream I* stands as the law of the case, and very little remains to be done at this point in time in order to complete a full de novo review of the record.

When the record on appeal consists solely of documentary evidence, this Court can make an independent review of the record. *See Shipley v. Cook,* 109 Idaho 537, 538, 708 P.2d 942, 943 (Ct.App.1985) (interpretation of written instruments presents question of law); *General Dynamics v. Zantop Airlines,* 147 Ariz. 92, 708 P.2d 773 (Ct. App.1985) (where finding of trial court is based entirely on documentary evidence, appellate court may make independent decision); *Dowling v. Southwestern Porcelain,* 237 Kan. 536, 701 P.2d 954 (1985) (Supreme Court is in just as good a position to interpret documents as trial court); *Brooks v. Tanner,* 101 N.M. 203, 680 P.2d 343 (1984) (same); *Budget Systems v. Seifert Pontiac,* 40 Colo.App. 406, 579 P.2d 87 (1978) (reviewing court not bound by trial court's interpretation of written documents).

Similarly, this principle has been applied to deposition testimony. *Saccomano v. North Idaho Shingle Co.,* 73 Idaho 284, 252 P.2d 518 (1952). Here we have a mixture of deposition testimony and documentary exhibits; accordingly we have decided to pick up where *Airstream I* left off and complete an independent review of the record.

First, however, we pause to note that this is a particular set of circumstances where in proceedings on remand neither party presented any new evidence whatsoever, and certainly none "relating to course of dealing and usage of trade [which] could be relevant in resolving this dispute." *Airstream I,* 111 Idaho at 307, 723 P.2d at 851. It is abundantly clear that Airstream sold the two trailers to Shuler, and that Shuler in turn delivered them over to his two customers, and secured titles for the customers. Equally clear, Mr. Shuler recognized that he owed the purchase price for the two trailers, and made out two checks to the order of Airstream, which Shuler delivered to CIT's Boise offices, at least a month after delivery of the trailers, and which CIT mailed on to Airstream with the CIT endorsement mistakenly placed thereon. We note also that Airstream initially did not bring suit against CIT based on a

claim that CIT had promised to pay Airstream the purchase price of the two trailers, but rather only on the claim that CIT was liable as an accommodation endorser, per the Uniform Commercial Code. When CIT moved for summary judgment based upon the affidavit of Kristin Haustveit,[2] it was only then that Airstream sought and obtained district court approval to amend its complaint and include a claim of breached contract.

The issue as things now stand need not turn on any further application of the Uniform Commercial Code, but is simply to determine whether CIT has any liability to make good in full or in part the loss suffered by Airstream in selling and delivering the two trailers to Shuler, Shuler having in the interim relieved himself of any obligation by resorting to the bankruptcy court.

In completing an independent review of this unusual transaction, we perceive that the proper starting point is at the end rather than at the beginning.

Presumably Mr. Forsythe and Mr. Little each received his trailer, and of equal importance, also received title thereto. Statutory law, I.C. § 49–401, in effect at the times pertinent, defined motor vehicles to include house trailers. As to house trailers which were new and previously unsold at retail, and which were "being titled for the first time, no certificate of title or registration shall be issued unless such application is indorsed by a franchised new car [house

trailer included therein] dealer authorized to sell such new motor vehicle." I.C. § 49–405.[3] Shuler was such a dealer.

It is important to note that, although Airstream utilized a Manufacturer's Statement of Origin (MSO) form as evidence of title in shipping and in delivering its trailers (units) to Idaho, Idaho's titling or registration procedures did not then include either certificates of origin or manufacturer's statement of origin.

Airstream's Mr. Ramga apparently did not know this, as witnessed by the procedure which he set up and over which he presided, delivering the trailers to the various dealers, and delivering by mail to the various financing agencies the respective MSOs which *were thought to be required* in order to title the vehicles.

By Mr. Oberrecht:

Q. Carl, did Airstream give anything of value to the financing institution in return for the financing institution agreeing to pay Airstream for the trailer?

A. Yeah. They gave them title to the trailer.

Mr. Oberrecht: That's all.

----------

By Mr. Welsh:

Q. Just a couple questions on that point. You say they gave them title to the trailer?

A. Sure. The M.S.O., which is the first legal document denoting ownership.

---

**2.** This affidavit paralleled her later deposition testimony as recounted in *Airstream I.*

**3.** In 1980, this section was amended to provide:
(c) In the case of a new motor vehicle being titled for the first time, no certificate of title or registration shall be issued unless such application his indorsed by a franchised new motor vehicle dealer licensed to sell such new motor vehicle in the state of Idaho. Each such application shall be accompanied by a *manufacturers' certificate of origin or manufacturers' statement of origin* executed by the manufacturer and delivered to his agent or his franchised motor vehicle dealer. No person shall bring into this state an untitled new motor vehicle unless he has in his possession a certificate or statement of origin. The cer-

tificate or statement of origin shall be in such form as set by the Director in accordance with the provisions of the Administrative Procedures Act and shall contain the year of manufacture or the model year of the motor vehicle, and the manufacturer's vehicle identification number of the motor vehicle, the name of the manufacturer, the number of cylinders, a general description of the body, if any, and the type or model. *Upon sale of a new motor vehicle, the manufacturer, his agent or franchised dealer shall execute and deliver to the purchaser (an) assignment of the certificate of statement,* together with any lien or encumbrance to which the vehicle is subject.

Q. In this case, the documents before you both reflect the M.S.O.'s were made out to Wheels Unlimited, were they not?

A. That's true, but C.I.T. had possession of it.

Q. Do you know if in Idaho, in 1979, at the time these M.S.O.'s were shipped, if the Department of Motor Vehicles required an M.S.O. before they would issue a title, certificate of title?

Mr. Oberrecht: Objection. Immaterial. You can go ahead and answer.

A. The Witness: I have no way of knowing.

Mr. Welsh: Okay. I have nothing further.

A. The Witness: To my recollection, there was just one state in the U.S.A. that was not an M.S.O. state. That was Tennessee. I think all the other states you had to have that document to obtain certification.

It is thus seen that Mr. Ramga was incorrect in believing that Tennessee was the one state which was not an MSO state.

Mr. Buzan testified that the Idaho titling procedure was such that Idaho dealers *could* in 1979 sell units which were subject to CIT's flooring plan financing contract without getting prior approval and without advising CIT that it had done so. To forestall such nefarious conduct CIT would regularly run inventory checks on the dealers' lots in order to ascertain that all floored units were on hand. He stated that the MSO forms served no purpose insofar as protection was concerned—simply because they were not required for obtaining Idaho titles on new units.

*Airstream I* illustrated the mechanics of a floor plan arrangement and the involvement of a MSO:

Under this arrangement, CIT had to "pre-commit" to floor a vehicle. If CIT "pre-committed" to floor a vehicle, Wheels Unlimited would receive the vehicle and notify CIT of the receipt of the vehicle. CIT would then issue payment to the manufacturer in exchange for cer-

tain documents necessary for titling the units referred to as the manufacturer's statement of origin (MSO). CIT would retain the MSO's until payment was received from Wheels Unlimited, usually after the unit was sold to a customer.

*Airstream, Inc. v. CIT Financial Serv., Inc.,* 111 Idaho 307, 309, 723 P.2d 851, 853 (1986). The pre-commitment would be given at the request of Airstream because of Airstream's interest in knowing if the dealer's (here Wheels Unlimited) floor-plan financing institution (here CIT), could accommodate units which dealer had ordered. If so, CIT would so advise by telephone and send a written authorization so confirming. As pointed out in *Airstream I,* repeated above, when the unit was delivered to the dealer the invoice and MSO would go to CIT. CIT in turn would then remit the invoice amount to Airstream. Until Wheels Unlimited (Shuler) sold the unit, CIT was supposed to hold the "paperwork," meaning the MSO, until the dealer would remit to CIT that amount which CIT put up to Airstream, plus financing charges.

Asked if the paperwork (MSO) was *transferred* to Shuler, Buzan said, "No, just physically *gave* it to them." Asked "What good does holding the paperwork do?" Buzan answered, "In 1979, none whatsoever in the state of Idaho." Deposition of John Buzan taken at Portland, Oregon, August 11, 1981.

Mr. Shuler, who operated Wheels Unlimited, was also asked about the MSO:

Q. What is the manufacturer's statement of origin? Is that like a title?

A. It would be the original title.

Q. Okay, from the manufacturer?

A. Certificate of title from the manufacturer, yes.

Q. Okay, and then as a—

A. *Now it's a requirement.* It was not at that time but it now is a requirement of law for title and you have *to have the original,* you know, manufacturer's statement of origin, *MSO, for titling now with the application.*

Q. In order to get a title from the State, do you take this MSO to the State and they issue, the State issues a title in exchange for the MSO?

A. Now they do. Prior—well, July of 1980 was the first actual—you know, was when the requirement became law. *Prior to that the dealer could make application without an MSO.*

*       *       *       *       *       *

Q. *In the case of these two units did you* ever use the MSO? In other words, did you actually *transmit the MSO to the Department of Motor Vehicles*?

A. *No.*

Q. Do you have copies of the titles for these two units—

A. No.

Q. —in your files?

A. No.

Q. In your file would you have an application form that the dealer prepares to ask the Department of Motor Vehicles to issue a title to Forsythe and Little?

A. Depending on who filed the title. If I filed the title, I would probably have a copy of the receipting of that title. If I didn't file the title, I would not.

Q. I believe that you said that when there was flooring by CIT, they required a UCC–1 be signed?

A. No, we had a blanket UCC–1.

Q. To cover any floored units?

A. Yes.

Deposition of Kirk Shuler, taken at Boise, Idaho, August 4, 1981 (emphasis added).

The testimony of both Buzan and Shuler as to the state of the law relative to titling in 1979 makes it abundantly clear that Shuler would experience no trouble in accepting payment in full from Forsythe and Little, and contemporaneously obtain for them certificates of title to their respective Airstream trailers without being obliged to obtain the MSO's from CIT.

Shuler admitted that he had received physical delivery of the two units before he delivered the two checks to Buzan at CIT's offices in Boise, and received the MSO on each unit together with the invoice on each unit. He had testified earlier that same morning relative to delivering the two checks:

Q. Did you deliver these checks shown on Exhibit 1 to CIT?

A. Yes.

Q. Do you recall delivering them to CIT?

A. Yes.

Q. Who did you give them to?

A. John Buzan.

Q. Did you get the MSOs and the invoices at that time when you delivered the checks?

A. I don't recall if I got them at that time but I assume I did.

Q. Did you have any discussion with John Buzan when you delivered the checks?

A. Well, when he notified me that they were in—you know, he is somewhat of a perfectionist person and he seems to review your entire detail again, sometimes unnecessarily, but explained how the procedure was to be handled, the checks were to be made to Airstream, that these were handled under a, you know, no number authorization and, therefore, that they should be made out directly to Airstream or they'd pass the checks back to Airstream and he, you know, *said they were not authorized for floor planning and that, therefore, they are simply a clearing situation or accommodation for the manufacturer* and they really don't have anything other than a transaction basis and that they would pass the MSO paperwork to me when I get the checks to them.

Q. Mr. Buzan actually said those things to you?

A. Yes.

Q. Was that over the telephone or in person?

A. That was on the telephone.

Q. Do you recall what the date was of that telephone conversation?

A. Not for sure. Whenever the MSOs came in, he called me and said, These are these, you know, this is what it is and, you know, I'll need these checks and make them out to Airstream and this is what it is and went on down through the procedure, *probably reaffirmed that these were not floored units* as you know and probably gave me a little lecture while he was at it.

Shuler was somewhat equivocal as to the validity of the two checks:

Q. When you issued these two checks in May of 1979, May 7th 1979, did you have funds in your account to cover those two checks?

A. On that date, I don't know.

Q. Did you learn subsequently that the checks would not clear?

A. Well, there was anticipation of funds to cover those checks or I would not have written the checks.

Q. Can you tell me what happened then?

A. No, I really don't know, a myriad of events, you know.

MR. WELSH: All right, I don't have any further questions.

On further examination by Mr. Oberrecht, when Shuler was asked about presold units:

[W]ouldn't it be easier to have the paperwork go through your floor plan institution even though you had exhausted your flooring limit so that the floor plan institution would keep the paperwork, the MSO and the invoices, and then only transfer that to you when it received your payment after you got it from the customer?

Shuler explained:

A. Well, by doing it through a third party it allows a certain amount of flexibility in time frame. You can either pay it immediately or sometimes, if necessary, you can sit on it to a certain extent, buy a few more days, make arrangements with the manufacturer under the circumstance to allow the institution to hold it a few days or whatever. It keeps you from writing checks sometimes that normal banking would beat the deposit to the bank, you know.

\* \* \* \* \* \*

Well, I don't recall exactly why we ran it through CIT but I believe, *as best recollection will have it,* that *I planned to take them through CIT so that we would have time to get the funds available,* and I think *Forsythe had a trade* and I think there was a flooring of a used unit that needed to be done when that was delivered, and a *used unit has to be inspected by a floor plan source.* And those transactions have to be completed before you have the funding to take care of it.

Mr. Carl Ramga was the Airstream official in charge of transactions where the Ohio factory sold units to dealers such as Shuler where the floor-planning was provided by CIT. In the early stages of the litigation Airstream filed Mr. Ramga's affidavit stating this:

During the year 1979, I was the comptroller and national credit manager of Airstream, Inc. In that capacity, I was in charge of payment and credit arrangements between Airstream, its dealers and its dealers' financing institutions. I am familiar with the Airstream policies regarding such arrangements and I am also familiar with arrangements Airstream, Inc. had with Kirk Shuler's Wheels unlimited and its financing institution, CIT Financial Services, Inc.

During the year 1979, Airstream, Inc. manufactured sold travel trailers to dealers throughout the United States. Airstream took payment for trailers it delivered to its dealers under two specific types of arrangements:

1. C.O.D.—Airstream would ship the trailer along with the manufacturer's statement of origin and the invoice directly to the dealer, and the driver of the delivery vehicle would exchange the trailer and documents for payment made directly by the dealer; and

2. Floor Plan Financing—Airstream would ship the trailer directly to the dealer and send a designated floor plan financing institution the manufacturer's statement of origin and invoice, and the floor plan institution would make payment directly to Airstream once it had confirmed that the trailer had been delivered.

Whenever a dealer ordered a trailer from Airstream which was not to be paid for on delivery, but was to be financed by a floor plan financing institution, company policy required an Airstream employee to obtain telephonic approval for the floor planning arrangement from the designated floor planning institution prior to the time the trailer was shipped. Whenever such telephonic approval was obtained, the Airstream employee who obtained that floor planning approval placed an approval stamp on a copy of the invoice, noting the date the approval was obtained, the person who gave the approval, an approval number if applicable, and a delivery date for the trailer. Under such arrangement, Airstream would ship the particular trailer to the dealer and send the manufacturer's statement of origin (the original title document) to the floor plan financing institution along with an invoice for payment. The floor plan financing institution would contact the dealer to insure the trailer had been delivered in good shape when the floor plan financing institution received the paperwork on the trailer. Thereafter, the floor plan financing institution would make its payment directly to Airstream and make its own arrangements with the dealer for delivery of the title paperwork to the dealer in return for payment by the dealer to the floor plan financing institution once the trailer had been sold.

During the time I was employed by Airstream, Inc., Airstream only took payment for trailers it delivered to dealers on the two basis set forth above. Airstream never entered into a transaction with a financing institution whereby the financing institution would merely transfer the title paperwork for the dealer's check and simply send the check to Airstream. Such an arrangement was never contemplated by Airstream, and would have served no purpose whatsoever for Airstream. I never authorized Sharon Lescowitch or any other employee of Airstream to enter into such an arrangement for Airstream. It was company policy, which was strictly adhered to, to sell trailers only on a C.O.D. or floor plan basis.

Later at the taking of his deposition on July 14, 1983, Mr. Ramga remembered one transaction which was decidedly different from the statements in his affidavit:

Q. At some point in time, did Kirk Shuler become a problem dealer from the standpoint of finances?

A. Yes. He became unable to pay his bills. You asked about C.O.D. There was one circumstance where he had a sold trailer—he had presold a unit to a customer. The arrangement there was that on delivery the bank would give us a cashier's check for it, and I think we held it up five or six weeks before the Bank called and told me they had good funds available to pay for that unit. Meantime, the customer called us almost every other day wanting to know when he could have his trailer.

Q. So, I take it you didn't really get a cashier's check that time?

A. We got a cashier's check from the bank, yes.

Q. Oh. You did not get—

A. *The bank merely acted as a friend to both sides in that situation.*

Q. What do you mean by that?

A. Kirk took the money to the bank, good funds to the bank. The bank held them for us and released the funds to us on delivery of the vehicle.

Q. Did you retain the M.S.O. until you got the funds?

A. *We retained the M.S.O.* In that case, *the bank* that Kirk dealt with *acted as an intermediary for us.*

Q. But you retained the M.S.O.?

A. *We retained the M.S.O., yes.*

Q. *To whom did you ship it then when you received the funds?*

A. *The bank. And then they transferred it to him.* That was an unusual set of circumstances.

Q. And what bank was that?

A. I can't remember.

Q. Was it C.I.T.?

A. No it was not C.I.T. It was the local bank in Boise that he dealt with.

Q. Was that the arrangement that was involved in these two transactions in this case?

A. No, not at all. These two units here were floor planned pure and simple.

MR. OBERRECHT: No further questions.

\* \* \* \* \* \*

Q. *In the affidavit* you previously filed in this case, *you indicated* at one point that during the time you were employed by Airstream, *Airstream only took payment for trailers that were delivered to dealers on the two bases of C.O.D. or floor plan.*

A. *Right.*

Q. *That is not true.* There was at least the third basis that you used with this bank either in Boise or Pocatello where they acted as a friend for both parties.

A. *That's correct.*

Q. So, *there was at least that occasion that you did handle it differently;* is that correct?

A. *Yes,* we did. *The reason being,* of course, *Airstream had a national image to protect.* We had a customer who was involved with a franchise dealer of ours who obviously had given someone a part payment on that trailer. Now, he wants a trailer, and Kirk was in no position to give it to him and pay for it at the same time. *We felt we should help the customer.* And Kirk hoped in that case, so we went beyond the normal limits to make sure that the customer got what he had contracted to buy from Kirk.

Deposition of Carl Ramga, taken at Sidney, Ohio, July 14, 1983.

It is evident from their testimony that both Sharon Lescowitch and Carl Ramga were aware of Shuler's poor financial condition. It should not have come as any great surprise that CIT on sending to Airstream the CIT forms captioned Delivery Authorization to Distributor or Manufacturer, wrote thereon, in Buzan's admitted handwriting, "Presold to Forsyth. Do not floor," on one unit, and on the other, "Per Sharon Pre–Sold to Archie Little. Do not floor." Airstream's contention is based on that portion of the Delivery Authorization, signed "C.I.T. Financial Services by John Buzan," which reads:

You are authorized to deliver described merchandise under the C.I.T. Financial Services, Inc. Wholesale Plan to the dealer named, provided delivery is made within 30 days of approval date shown above. Upon delivery of the described merchandise and collection of dealer's security deposit (down payment), if any, complete Bill of Sale below and present the following required documents to us. We will pay you the amount unpaid on the invoice up to 100% of total (excluding any delivery charges):

1. Original dealer invoice marked Paid by C.I.T. Financial Services, Inc.

2. This delivery authorization (including completed Bill of Sale).

3. If merchandise is Mobile Home, Certificate of Origin.

C.I.T. Financial Services, Inc.

By: /s/ John Buzan

Mr. Buzan was asked about this, and responded:

Q. Okay. Following use of—you've already testified that at least to the unit that is described on Exhb. No. 2, you received a phone call from Sharon?

A. Yes.

(Recess: 12:30—12:33)

Q. Looking again at deposition Exhb. 2, 1 and 2.

A. Uh-huh (affirmative response).

Q. And we've already discussed the provision in the upper right-hand side corner that was read to you, where your signature appears, could you explain why on the printed form it says, upon delivery, you're authorized to deliver, etc., pursuant to Wholesale Plan. It refers to Wholesale Plan. What is a Wholesale Plan?

A. That is a plan that the District Sales Manager, the region sets up with the dealer. This is a paper work that I'm not totally involved with in all the different documents that they use. It's the agreement in which we operate our business with the particular dealer. I had no decision making or even recommendations on them, I simply work up to credit limits. As far as this is concerned I don't know.

Q. This suggests flooring, does it not? The printed portion of this form?

A. That's correct.

Q. And then this written, your handwriting says "Presold do not floor"?

A. That's correct.

Q. Can you explain why you signed the printed portion that you believe suggests flooring and then said presold?

A. This is approval to ship all the paper work. This is the standard form. Had I known this was going to happen, I would have changed it. Everybody knows the approval to ship was this way. Any additions, addendum and change would be put in text. It is my confirmation of what they are asking.

Q. Were you intending or agreeing to floor these units?

A. No.

Q. Did CIT to your knowledge ever agree to floor the two units in the question?

A. CIT was not even aware of the units. John—I was aware of these units.

Buzan Deposition, pp. 53 to 54.

By contrast is the testimony of Sharon Lescowitch. She identified from Airstream's files the documentation which she had prepared in this transaction, one of which documents was SHIPPING/BILLING INSTRUCTIONS, an internal Airstream Form. *See* Exhibit No. 1, unit J 2631, attached hereto as Appendix A, and Exhibit No. 2, unit T 2580, attached hereto as Appendix B. Ms. Lescowitch testified that she called John Buzan to get and did get his "telephonic approval" for shipping and floor planning both units, and she wrote on the instruction form "Ok John Buzan." She recognized her own handwriting, and did remember talking to him, but her recollection other than that was based on the documents and her belief as to what would have taken place.

She could add nothing concerning "CIT tell them its sold unit," on J 2631, and "CIT ask for John," on T 2580. She recognized the handwriting as being Marvin Ward's, a then resident Sales Coordinator who took the order from the dealer, Shuler.

Her testimony was that J 2631 "was to be floor-planned through C.I.T."—which conclusion she drew not because of independent recollection, but rather because of the markings and the comment in the floor plan box.

Marvin Ward's testimony was not obtained. John Buzan was positive in his testimony that "Presold to Forsyth," appearing on the Delivery Authorization was in confirmation of what she told him when calling from Ohio:

Q. So as I understand it, Mr. Buzan, your formal procedure in flooring arrangements or in making flooring arrangements with Airstream and Wheels Unlimited was that somebody from the Airstream factory would call you and tell you that the order had been placed with them by Wheels Unlimited, would describe the item or items ordered, give you the price and ask you whether or not CIT was going to approve the flooring and thereafter you would tell them whether or not flooring was approved?

A. That's correct.

Q. Once the flooring was approved, you mentioned that you would send a doc-

ument showing that the flooring had been approved to Airstream; is that correct?

A. That's correct.

(Delivery Authorization, EXB. 1, Delivery Authorization, EXB. 2, marked for identification)

Q. Mr. Buzan, I'm handing you what has been marked Exb. 1. I'll ask you to take a look at that.

A. (Referring).

Q. Is that one of those documents that you were referring to?

A. Yeah.

Q. And can you tell whether or not you prepared that document?

A. I did.

Q. Did you prepare all of the handwriting on that document?

A. Yes.

Q. May I see that document, please?

A. Um-hum. (Handing document.)

Q. (Referring). In the upper left [sic, right] [h]and corner of that document, is that statement with your signature under it that appears to me to be a flooring approval; is that correct?

A. Yes and no. If it's to be floored, correct. If not, it's also an authorization for delivery which in this case it is. It clearly states it is not to be floored.

Q. The document itself states in the upper left-hand corner after CIT Financial Services title I take it, delivery authorization to distributor or manufacturer?

A. That's correct.

Q. That doesn't say anything in title relative to whether or not it's a flooring authorization, does it?

A. No.

Q. Okay. With respect to the paragraph, the typed paragraph on the right-hand side of that form up at the top?

A. Um-hum (affirmative response).

Q. That is indeed a flooring authorization, is it not?

A. That is.

Q. And you have signed that for CIT?

A. I did.

Q. There is some writing in the description portion toward the middle of the page in someone's hand. Do you see what I'm referring to?

A. Yes.

Q. What is that writing?

A. What does it say?

Q. Yes.

A. It said "Presold to Forsyth. Do not floor."

Q. Did you provide that writing?

A. That is confirmation of what I was told by Sharon at the Airstream factory that this unit was presold by the dealer, not intended for flooring by CIT, but actually *delivery authorization that we would hold the paper work until we collected the dealer's check.*

Q. Sharon told you that CIT didn't intend to floor it?

A. Sharon called and said we have a presold unit and it's not for flooring.

Q. What is Sharon's last name?

A. I have no idea.

Q. Was Sharon someone at Airstream with whom you dealt frequently?

A. I would have to say yes. I think there was three different people that called for flooring approval from Airstream, Sharon was one of them.

Q. Do you recall the date of that telephone conversation?

A. I don't recall the date, no. I would assume it's the same date of the approval since I generally wrote these as I talked to the people.

Q. So you say Sharon called you and said that this was an item that had been ordered by Wheels Unlimited, it was presold and not to be floored by CIT?

A. That's correct.

Q. Had anyone at Airstream ever called you and told you that there was a presold unit that was not to be floored by you before?

A. Yes.

Q. And who were those individuals who called you?

A. I wouldn't know.

Q. Did that happen on more than one occasion other than this?

A. I wouldn't really be able to tell you. We had 12 wholesale dealers and we worked with 20 some manufacturers and sites. This was standard operating procedure. This was not the first time we had a presold unit for Wheels Unlimited nor was it the last time the factory called.

Q. Now, I'm talking about Airstream particularly?

A. I'm talking about Airstream particularly. It happened prior to these two particular times and after these two particular times where they wanted us to hold onto these presold units.

Q. You made reference to holding the paper work or presold units, what paper work are you referring to?

A. The certificate of origin or manufacturer's statements of origin.

Q. The invoices?

A. Invoices were billed to CIT and have no value to anybody.

Q. The invoices were billed to CIT on these items?

A. I don't know if they were on these items are not. They probably were. Generally they have a stamp made up and that says who to and how much and bill the two different addresses:

One, so they know where to send the physical commodity, and the bill.

Two, is where the paper work goes to. Some organizations get all their paper work at a post office box and yet has a building, sort of an operation where two companies or three companies are involved.

Q. When you operated under the normal flooring arrangements with Wheels Unlimited with Airstream, the invoice would go to CIT also, would it not?

A. That's correct.

Q. And CIT would pay the invoice?

A. That's correct.

Q. So, you're saying that the same sort of arrangement happened with this particular trailer described on Exb. 1 and I take it the only difference between a normal flooring arrangement and for the trailer on Exb. 1, was, demonstrated by your handwriting down under the description portion of that form.

A. Plus whatever records Airstream had, indicating it was to be called in as a phone floor item. CIT did not generate the call on the particular items.

Q. Well, CIT does not generate the floored items?

A. Correct. We respond to their request.

Q. And CIT would have been called.

A. Yes.

Q. Did CIT ever floor a presold unit for Wheels Unlimited?

A. We have ended up flooring a presold unit although I don't believe we did for this particular dealer.

Q. Mr. Buzan, it's not too uncommon to floor a presold unit for CIT rather to floor a presold unit for a dealer when the dealer hadn't already received from the customer is it?

A. *My branch, when I was there, did not floor presold units.* At the direction of our District Sales Manager flooring you have to understand is two percent over prime and back in those days, you're talking 18 and 15 percent.

Take a $15,000 trailer and put it on flooring at 22 percent and you had secured basis. Interest accrues daily and even five days on that amount is an awful lot of money. If the dealer had an arrangement with the factory that it's not going to be floored and when he collected the money for the customer and paid off the trailer at that time the factory also had an agreement because that's the way it was called in. What we did with approved flooring or anything else we responded to we request either you do it this way or you don't do it this way.

Unless it was authorized to do as requested, my branch did not floor any presold units or any dealer manufacturer did not.

Q. Ever?

A. I did not, no. I've never floored a presold unit. If the dealer got the unit, three weeks later the customer backed out of it, then he would request flooring, he would go back to the factory and say "That deal didn't go through, would you floor, if you have room?"

"Yes, we would floor it."

To my knowledge it never happened with this particular dealer.

Q. When you were working for CIT in Boise, did you handle very many presold units for your customers?

A. We handled presold units. They are not our customers, they are customers of the sales organization. Whatever happened to be or are you talking my customer as being the dealer.

Q. Yes.

A. Not the person who bought the unit.

Q. Right.

A. Yes, I'd say we probably sold three or four a month.

Q. In every situation where you handled a presold unit for a dealer when you were working for CIT in Boise?

A. Um-hum (affirmative response).

Q. Did you handle every one of those circumstances as a paper work handler, if you will?

A. Yeah, we had no involvement with it.

Q. Had no obligation to pay the manufacturer?

A. It's my understanding we did not.

Q. And is that the way you considered the transaction illustrated by Exb. No. 1?

A. Yes, that's correct. It said not floor it and I had no intention of flooring it at any time. If it was never approved for flooring, the matter would not be paid by CIT and was not paid by CIT.

Q. In these three or four presold units that you handled per month as manager

of the Boise office, how did you make payment to the manufacturer?

A. CIT did not make payment to the manufacturer. The dealer pays the manufacturer direct. Normally, they would route the check through our branch so they could get that paper work their MSO.

\* \* \* \* \* \*

Q. Did you on behalf of CIT agree with Airstream that you would accept the paper work, meaning the MSO, Manufacturers Statement or Origin and the invoices from Airstream and hold those invoices until you took payment from Kirk Shuler and that you would then make payment direct to Airstream?

A. No. No.

MR. WELSH: Let me object to the form of the question. I don't know "payment," if he understands what payment means. I think it may be a little misleading.

Q. Go ahead and answer.

A. The answer to the question was, no, we were never instructed to make payment direct to Airstream. My instructions were they were presold, not to be sold. We would send the paper work. Upon release of the payment by the dealer, CIT was not asked to pay for or to floor on or have any financial obligation on presold units.

*Presold units are between the dealer and manufacturer.* We're only in the middle. Okay. We were not asked to pay for it and therefore it was not approved for payment. *It was approved presold. Do not floor it. That means don't pay for it.* Don't floor it. That's what they are telling us per Sharon on the original, I think we were complying with their original request. That is how they want it done.

Q. Did you send Exb. 1 and 2 as they were right there without any further additional information and without any less information than they contain to Airstream?

A. Yes, I assume this is a copy of that original that Airstream has.

Q. Airstream was sent the original?

A. Oh, yes. I assume that's what these are.

Q. Are these not copies of their originals?

A. Those are photocopies, that is not a carbon copy.

The opinion in *Airstream I*, 111 Idaho at 311–12, 723 P.2d at 855, 856, stated:

In support of this argument, appellant points specifically to the testimony of Buzan who described in detail that after he received a telephone call from Airstream he immediately filled out CIT's standard forms, writing on them 'pre-sold' and 'not to be floored,' and mailed them to Airstream. The district court's findings make no mention of Buzan's uncontradicted testimony that he mailed these CIT documents to Airstream, nor do the court's findings mention these documents, copies of which are contained in the record.

Then, following the reaffirmance of the Pierstorff Rule, it was held that:

Thus, the district court's factual findings that these transactions were financed by CIT under its flooring plan, and that CIT 'gave Airstream no notice that it objected to the contents of the confirmations,' are contrary to the evidence and are clearly erroneous. The CIT documents which Buzan testified that he mailed to Airstream expressly negated the use of the flooring plan arrangement regarding these transactions, and accordingly the district court's conclusion of law number 1 that 'a contract existed on the terms of the invoices mailed to CIT confirming that CIT would finance the transaction between Wheels Unlimited and Airstream' is equally erroneous.

Airstream argues that the district court's conclusions that the set transactions were financed under the floor plan and that CIT did not object to Airstream's invoices is supported by the testimony of the Airstream employees. Airstream cites to portions of the Airstream employees' depositions where each of the employees denies having ever seen the documents CIT alleges that it mailed. Assuming that Article 2 of the U.C.C. is applicable, I.C. § 28–1–201(26) and the cases interpreting it state that a party is deemed to have given notice once the notice is mailed. Whether it was received or noticed when received is immaterial. *Dougherty v. 425 Development Associates*, 93 A.D.2d 438, 462 N.Y.S.2d 851, 853 (N.Y.App.Div.1983); *Smith v. Butler*, 19 Md.App. 467, 311 A.2d 813, 816–17 (1973); *Hudspeth Motors, Inc. v. Wilkinson*, 238 Ark. 410, 382 S.W.2d 191 (1964). If Article 2 is not applicable, then ordinary contract law has a similar principle known as the 'mailbox' rule. *See* 1 Corbin on Contracts, § 78 (1963). Accordingly, the testimony of Airstream employees that they never saw the CIT memos which state that the units were 'not to be floored' would not alter the rule that the documents are deemed received when mailed.

*Airstream I*, 111 Idaho at 312, 723 P.2d at 856. And the opinion went on to add:

In this case, uncontroverted evidence in the record indicates that Buzan mailed documents which stated that the units were not to be floor planned. Thus, Buzan has given notice that the units were not to be floor planned, and the trial court's contrary finding is 'clearly erroneous.' Once Buzan gave this notice that the units were 'not to be floored' no flooring contract existed between the parties because of the conflicting confirmatory memoranda.

*Id.*

There being no new evidence introduced, there is nothing which can persuade us to retreat from those holdings in *Airstream I*.

While it is true that CIT was in a sense a gratuitous escrow which agreed to hold the MSO until Airstream received a check from the dealer, Shuler, there is no evidence presented which establishes that CIT did

not do so. Moreover, it is not beyond probability that Shuler, admittedly knowing that he was able to do so, accepted his customers' payments and obtained titles for them without using the MSOs which CIT admittedly had received from Airstream.

There is no acceptable proof that CIT had any reason to finance Shuler in his transactions with Little and Forsythe, and no acceptable proof that CIT did so.

What most clearly appears is that Airstream knew of two customers wanting to buy Airstream trailers, knew its dealer was unable to buy or finance the units, had a national image to protect, and was careless —careless in not knowing that Idaho was a non-MSO state, and careless in not requiring from the dealer a certified check or cashier's check before placing the dealer in possession of the two trailers.

We conclude that Airstream has fallen short in carrying its burden of proving that CIT was an accommodation endorser of the Shuler checks to Airstream, and also failed to prove CIT's breach of any contract or agreement, written or oral, to pay Airstream the purchase price of the two trailers it sold and delivered to Shuler.

The judgment of the district court is reversed and we remand to the district court with instructions to enter judgment dismissing the amended complaint.

Costs on appeal are awarded to CIT. No attorney fees on appeal.

HUNTLEY, J., and OLIVER, J. Pro Tem, concur.

SHEPARD, C.J., and BAKES, J., concur in result.

EXHIBIT NO. 1

Unit J 2631

SH. PING/BILLING INSTRUCTIONS

| DEALER | SERIAL # | SHIP DATE |
|---|---|---|
| Wheels - Boise | I 31A9J2631 | |
| TRANSPORTATION / HAUL-AWAY | DEALER PICKUP | CUSTOMER PICKUP |
| | | |
| COD | FLOORPLAN CIT Tell them it's sold unit | OTHER |
| PARTS 3/31 | STORE 3/31 | OTHER |

SHIPPING or DPU CONFIRMED BY Kirk Schuler (NAME)    (DATE)

SPECIAL INSTRUCTIONS

SIGNATURE    DATE

EXHIBIT NO. 2

Unit T 2580