389 P.2d 581

**D. K. ALLEN and Mary R. Allen, husband and wife, Plaintiffs-Respondents,**

**v.**

**RUBY COMPANY, a corporation, Defendant-Appellant.**

**No. 9191.**

Supreme Court of Idaho.

Feb. 18, 1964.

Calvin Dworshak, Jay L. Webb and L. E. Haight, Boise, for appellant.

Robert H. Remaklus, Cascade, Randall Wallis, Boise, for respondents.

KNUDSON, Chief Justice.

Under date of May 9, 1951, plaintiffs-respondents, D. K. Allen and Mary R. Allen, husband and wife, as lessors, entered into a mining lease with Warren Dredging Corporation, as lessee, whereby the lessee was granted the exclusive right during a period of twenty years to mine and extract from the leased premises, consisting of 160 acres, all minerals, ores, sands and mining products.

Under the terms of the lease the lessee agreed to pay to the lessors, as mining royalty, a sum of money equivalent to 10% of the net sales returns received from all mining products recovered by the lessee through mining operations upon the leased premises which were sold and disposed of by the lessee. The lease further provided that advance payments upon the mining royalty were to be made to the lessee on the first day of July of each year in an amount equivalent to $10 per acre on such portion of the leased acreage as remained undredged and unmined.

Under and by virtue of a merger agreement entered into by and between Warren Dredging Corporation and defendant-appellant, Ruby Company (effective May 1, 1959), appellant assumed and became liable for payment of all existing indebtedness and obligations of the lessee, Warren Dredging Corporation, including the obligation to perform the lease here involved.

Respondents commenced this action seeking to recover judgment against appellant in the amount of $3200 and interest, alleging that neither the Warren Dredging Corporation nor appellant has paid the advance royalty payments falling due under the terms of the lease on July 1, 1957, in the sum of $1600 and on July 1, 1958, in the sum of $1600.

Appellant filed an answer admitting the execution of the mining lease but denied that any sum was due and owing respondents under the terms and conditions of said lease. Appellant incorporated in its answer three affirmative defenses, the first of which in essence states that under the terms of the lease appellant is and has been excused from the payment of advance royalties and relieved from the performance of said lease because, since 1954 it could not mine the leased premises at a profit by reason of the decline in market price of the principal product from the premises, governmental acts and orders, and the increased cost of mining.

The second affirmative defense states that in pursuance of its good faith to dredge the subject property, and at great expense to itself, appellant placed a dredge upon the property, and during February 1953, through no fault or negligence on the part of appellant, the dredge toppled over, capsized and sank.

Under the third affirmative defense it is alleged that at all times material to this action appellant has been unable to conduct, at a profit or otherwise, any dredging or mining operations on the premises involved because of commercial frustration brought on by the so-called Korean War.

Appellant also interposed two counterclaims, under the first of which it is alleged that on April 14, 1959, respondents served

upon appellant a notice of forfeiture and appellant requests that the court decree the lease to be in full force and effect.

By the second counterclaim appellant alleges that the payment of $1600 (claimed by respondents to be due and owing on July 1, 1956) was made by appellant to respondents on the 25th day of October, 1956, in reliance upon promises of respondents to negotiate in good faith for a modification of said lease; that respondents failed to negotiate and appellant prays judgment against respondents for $1600 and interest.

The trial court granted respondents' motion to strike each of the affirmative defenses and also respondents' motion to dismiss each of the counterclaims and entered its order accordingly. Thereafter the trial court entered its order granting respondents' motion for summary judgment, from which order this appeal is taken.

Besides claiming error in granting summary judgment the assignments of error challenge the action of the court in striking each of the alleged affirmative defenses and dismissing the two counterclaims.

Appellant contends that it has alleged facts in its affirmative defenses, which, if proved, would excuse the appellant from performance of the obligations to be performed by it under the lease and would relieve it from any obligation to pay the advance royalty payments claimed. Appel-

lant relies upon section 20 of the lease, which provides:

*"Section 20.* It is agreed that the Lessee shall be excused and shall not be responsible hereunder for delays, failures or omissions in performance of any of the terms, provisions and conditions of this agreement incumbent upon it to be kept and performed, where such is due to or the result of inclement or winter weather conditions which would make performance of the agreement undesirable or impractical, or where the continuance of mining operations would be unprofitable to the Lessee, or where such is due to or the result of a cause of any kind beyond the control of the Lessee, including (but not limited to) fire, flood, war, governmental action or orders, strikes, lockouts, injunctions, inability to obtain power, failure of transportation facilities, or breakage of machinery or equipment."

This appeal is from the order granting motion for summary judgment and this review of its validity requires that the allegations of fact contained in appellant's defenses be considered as true. Idaho Rules of Civil Procedure, Rule 56(c). Therefore, for the purpose of this inquiry it must be conceded that during the years in question it was impossible for appellant to conduct mining operations on the premises described in the lease at a profit by reason of market conditions, breakage or loss of equipment and machinery, and governmental acts and orders, all beyond appellant's control.

The issue here presented arises as a result of the different interpretation placed upon certain terms of the lease by the parties to this action. There is no dispute of fact as to the wording of the lease, and the salient question which must be resolved requires an interpretation and construction of the terms in dispute.

Various rules and principles governing interpretation and construction of like instruments have been cited by the parties. We agree with the trial court's view that such rules have been fairly summarized by the writer of the annotation in 28 A.L.R.2d 1013 (at page 1016) as follows:

"In determining whether any particular occurrence which interferes with mining is within the scope of a clause excusing the payment of minimum royalties, the courts resort to the general rules which govern the construction of contracts. The cardinal rule is to determine and give effect to the intention of the parties. Ordinarily this intention is to be gathered from the words used in the contract and not from any unexpressed thoughts of the parties. But it has been said that in arriving at the intention of the parties where the

language is doubtful or susceptible of more than one construction, the court may consider the nature and situation of the subject matter and the apparent purpose or object in making the contract in the form in which it was made, or in using a particular expression or sentence. The court should consider the entire contract or lease when determining the meaning of a saving clause."

The subject instrument consists of approximately twenty-four legal-sized typewritten pages and it would unduly extend this opinion to incorporate it in its entirety herein. However, we deem it necessary to quote some of its provisions. Under its provisions the lessee (appellant) gained and lessors (respondents) relinquished substantial possessory rights to the leased premises together with the exclusive right to mine, extract and market all minerals and ores therefrom during a period of twenty years unless voluntarily terminated by the lessee. It is provided in section 3 of the lease that the lessors were to receive a mining royalty in an amount equivalent to 10% of the net sales returns received from the sale of all mining products recovered and sold from the property. The term "net sales returns" is specifically defined in the lease.

The lease also provides (section 4) for advance payments to be made by the lessee in the following quoted language:

"*Section 4.* As advance payments upon mining royalty (referred to herein as 'advance royalty'), the Lessee agrees to pay to the Lessors on the first day of July of each year commencing July 1, 1951, and continuing during the term of this Lease, a sum of money equivalent to $10.00 per acre computed on the following acreage within the following legal subdivision of the leased premises, and such acreage shall constitute the basis for determination of advance royalty payments to the Lessors and is referred to herein as 'advance royalty acreage':

[legal description of leased premises] Each such yearly payment shall constitute an advance payment on mining royalty to be paid by the Lessee to the Lessors under the provisions of Section 3 of this Lease; and it is recognized and agreed that the Lessee shall reimburse itself and deduct from accrued mining royalty all such amounts of advance royalty which shall have theretofore been paid hereunder.

"As mining or dredging operations are conducted upon the advance royalty acreage, the aggregate advance royalty payable to the Lessors shall be reduced by an amount equivalent to $10.00 per acre for the acreage so dredged and mined, with the result that advance royalty will only be paid with respect

to that portion of the advance royalty acreage remaining undredged and unmined."

The following quoted excerpt from section 3 of the lease is also pertinent:

"By way of reimbursing itself for advance royalty paid to the Lessors or their predecessors in interest (under the provisions of Section 4 hereof) the Lessee is hereby authorized to deduct from and retain from accrued mining royalty amounts equivalent to advance royalty theretofore paid to the Lessors or their predecessors in interest.

"All royalty payments, whether of mining royalty or advance royalty, shall be paid either directly to the Lessors or shall be deposited to the account of the Lessors in such banking institution as the Lessors shall designate in writing."

It should additionally be noted that the lease also provided that the obligation of the lessee to pay advance royalty payments would terminate if the lessors entered into a specific "pooling arrangement" with other lessors in the area, however, it is not claimed by either party that such "pooling arrangement" has ever been entered into—therefore such provision is not controlling as to any issue here involved.

Defendant-appellant contends that section 20 is an all-encompassing savings clause whereby if any one of the excusing conditions mentioned therein should occur the lessee would be relieved from any duty or obligation whatever, under the lease, including the payment of any royalty; that during the existence of any one of such specified conditions the lessee would retain the leasehold rights but would not be required to perform a single act or pay any sum whatever for such rights and the lessors would be helpless to terminate the lease.

Section 6 of the lease deals with the duty of lessee to carry on mining operations and provides:

"*Section 6.* Subject to the provisions of Section 20 hereof and excepting during winter months and during those periods of time when weather conditions make operation of the dredge undesirable or impractical, and only so long and at such times as mining operations can be conducted with profit to the Lessee, the Lessee agrees to diligently and continuously carry on and conduct mining operations upon real property in Township 13 or Township 14 North, Range 4 East of the Boise Meridian in Valley County, Idaho, for the removal of mining products therefrom. It is understood that the operations of the Lessee shall be in compliance with the provisions of this section so long as those mining operations are conducted at any place in said townships, and the fact that such mining operations are not

being conducted upon the particular real property covered by this Lease shall not effect or constitute a violation of this Lease, so long as advance royalty payments as required by the provisions of Section 4 hereof are paid or the pooling arrangement referred to in the final paragraph of that section is in effect. Mining or dredging operations upon the leased premises and reduction, milling or processing the mining products shall be performed by the Lessee in a mineral-like [sic] manner reasonably designed to extract and secure the greatest quantity of mining products, then having commercial value, from the leased premises."

It will be noted that said section 6 specifically fixes an obligation on the part of the lessee "to diligently and continuously carry on and conduct mining operations" under normal conditions. However, said section makes specific reference to section 20 and in substance provides that the lessee is not obligated to carry on mining operations during the existence of any of the conditions specified in such section. The fact that section 6 is expressly made "subject to the provisions of section 20" is a convincing factor that it was the intent and purpose of the parties that the provisions of section 20 were to excuse the lessee under the conditions specified therein, from its obligation to conduct mining operations. The only specific reference to the payment of royalties in either of said sections is contained in section 6, where it is stated that the fact that mining operations are not being conducted upon the leased premises shall not constitute a violation of the lease, "so long as advance royalty payments as required by the provisions of section 4 hereof are paid * * *".

The necessity of making royalty payments is also stated in section 19, the pertinent portion of which is as follows:

"It is agreed that time is of the essence of this Lease. In the event the Lessee shall fail, refuse or neglect to make any payments of advance or mining royalty as required herein, or shall fail, refuse or neglect to perform any covenants hereof incumbent upon the Lessee to be kept and performed, then and in that event, the Lessor shall have the option to declare this Lease forfeited, which option shall be exercised by written notice to the Lessee specifying the particulars wherein the Lessee is in default. * * *"

When this language is considered in conjunction with the provisions of sections 6 and 20, it is persuasive that the provisions of section 20 were not intended to excuse or relieve the lessee from the obligation of paying the advance royalties.

All of the leased premises here involved (consisting of 160 acres) are situate in Township 13, and it is noteworthy that lessee was not obligated, under any provision

of the lease, to conduct mining operations on the leased premises although the right of the lessors to receive the 10% mining royalty was dependent upon the sale of "mining products" removed from the leased premises. Consequently, were it not for the provisions requiring advance royalty payments, the lessee could conceivably enjoy the leasehold rights granted under the lease for the entire term of twenty years without payment of any amount except the $10 which was acknowledged as paid at the time the instrument was executed.

Under section 18 of the lease agreement the lessee may, at any time, without the consent or approval of the lessors, by written notice, terminate all its obligations to perform under the lease; "provided however, that such action by the lessee shall not relieve it from the obligation to pay the lessors all advance royalty or mining royalty theretofore accrued * * *". Such language makes it clear that not even a termination of the lease would relieve the lessee from the obligation of paying all advance royalties which had accrued as provided in the lease.

If the parties themselves have placed a construction upon the terms of the lease, the following quoted general rule stated in 58 C.J.S. Mines and Minerals § 186, p. 398, would appear to be applicable:

"The amount of rent or royalty payable by the lessee depends on the terms of the lease as construed by the general rules of construction, or by the parties themselves, in a proper case."

"*Construction by parties.* Where the terms of the lease are somewhat ambiguous as to the royalties, if the lessee pays royalties for some years on a certain construction of the terms, it will be regarded as the true construction, as against him; * * *".

The record discloses some instances where appellant lessee has, prior to the filing of the action, referred to its obligation to pay the advance royalty, which casts some light upon the interpretation it then placed upon the language of the lease dealing with its obligation to make advance royalty payments. This court has acknowledged it to be a well-recognized rule that, in construing an indefinite or ambiguous contract, the interpretation placed on it by the parties thereto is to be considered by the court and should be given great weight in ascertaining their understanding of its terms. Cottle v. Oregon Mut. Life Ins. Co., 60 Idaho 628, 94 P.2d 1079.

One of the instances to which we refer occurred during November 1956, when lessee caused to be forwarded to lessors a copy of its proposed amendment to the lease agreement. Section 3 of the proposed amendment provides:

"3. That Section 4 of the Mining Lease between the parties dated May 9,

1951, shall be amended, and in that connection the parties hereto agree as follows:

"As advance payments upon mining royalty (referred to as 'advance royalty'), the Lessee agrees to pay to the Lessors on the first day of July of each year, commencing July 1, 1957, and continuing during the term of the mining lease between the parties above referred to, so long as Lessee shall not conduct mining operations upon the leased premises, a sum of money equivalent to $5.00 per acre (in lieu of the sum of $10.00 per acre as provided in Section 4 of the original mining lease) computed on the advance royalty acreage as provided in Section 4 of the mining lease; provided, however, that in the event the Lessee shall commence to conduct mining operations upon said leased premises, any advance royalty payable thereafter shall be equivalent to $10.00 per acre computed on the advance royalty acreage; provided further that in no event shall the advance royalty heretofore paid under the mining lease dated May 9, 1951, or to be hereafter paid under the provisions of this Amendment to Lease, aggregate a total sum of more than $16,000.00, and that after the sum of $16,000.00 shall have been paid to the Lessors by the Lessee there shall be no further advance royalty payments due the Lessors from the Lessee by virtue of the mining lease dated May 9, 1951."

It is apparent that by the proposed amendment the lessee was endeavoring to reduce the minimum advance royalty from $10 per acre per year to $5 per acre per year "so long as lessee shall not conduct mining operations upon the leased premises." Upon the resumption of mining operations upon the leased premises the minimum advance royalty payable annually would return to $10 per acre, as provided in the original lease. The proposed amendment, if accepted, would also fix $16,000 as the maximum amount to be paid as advance royalty. It did not purport to change the lessee's obligation to pay advance royalty except the amount thereof. It should also be mentioned that the proposed amendment would enable the lessee to renew the lease for two additional 20-year periods, continuing until April 30, 2011.

Another instance which casts some light upon lessee's interpretation of the language here being studied is a statement contained in a letter written by counsel for lessee addressed to counsel for lessors, bearing date October 3, 1957. After making reference to a proposed amendment to the lease which

had been submitted on behalf of lessee, the writer stated:

"As I mentioned to you today, we would be willing to make the minimum royalty payment to Mr. Allen which was due on the first day of July, 1957, provided we could have an understanding with respect to this proposed amendment."

By this language it is acknowledged that the minimum royalty payment was due on the first day of July, 1957, and there is no mention in the letter of any claim or contention that it was not payable; the lessee simply wanted the lessors to consent to the proposed amendment which included, among other things, a provision reducing the advance royalty and the payment would be made.

The record does not disclose just when the lessee first asserted the construction that it now contends for. It is alleged in appellant's affirmative defenses that during February 1953 the dredge, which lessee had placed on the property, capsized, toppled over and sank; that since 1954 appellant, because of depressed price conditions, has been unable to conduct at a profit or otherwise any dredging operations of any kind. Lessor D. K. Allen testified that all advance royalties were paid to and including 1956. Appellant states in its brief that it filed an answer admitting payment of royalties in the amount of $8000. Respondent argues that the fact the advance royalty payments were paid for the first five years of the lease is proof of appellant's knowledge and belief that it was liable for such payments.

We are in accord with the rule that where it is possible so to do, such a construction will be placed upon ambiguous, uncertain or apparently inconsistent provisions of a contract as will give protection to both parties, as against a construction which would be only in the interest of one of the parties to such contract. Clark v. Paddock, 24 Idaho 142, 132 P. 795, 46 L.R.A.,N.S., 475; Twin Falls etc. Fruit Co. v. Salsbury, 20 Idaho 110, 117 P. 118.

We think it clear by the terms of this lease that the lessors were not leaving entirely to the caprice or choice of appellant, without compensation, the right to test or not to test, or to develop or not to develop this land. The provisions in the lease for the payment of a minimum advance royalty of $10 per acre per year on the unmined acreage was about the only incentive the lessees had in making prompt development, and likewise was consideration to the lessors for the use of their land as long as lessee retained possession of it for any purpose contemplated by the lease.

There is no question that the existence of any of the conditions enumerated in section 20 excused appellant from performing mining operations, and, consequently, from paying mining royalties. However, we do not construe said section 20 as relieving appel-

lant from the obligation to pay the advance royalty payments during the existence of any such conditions.

We have studied the reasoning applied by the trial court in arriving at the construction it placed upon the instrument in question, and although such determination is not binding upon this court, we feel that it is persuasive. In Lundin v. Hallmark Productions, Inc., 161 Cal.App.2d 698, 327 P.2d 166, it is stated:

"Whether a contract is, in any of its terms or provisions, ambiguous or uncertain is a matter of determination, in the first instance, by the trial court. This court is not bound by the trial court's determination where such determination has been made without resort to extrinsic evidence. [citations]

"However, it is also the rule that where no extrinsic evidence has been introduced, the interpretation placed upon the contract by the trial court will be accepted by this court if such interpretation is reasonable, or if the interpretation of the trial court is one of two or more reasonable constructions of the instrument. [citations]"

We believe the interpretation placed upon the instrument by the trial court is a reasonable one. Under such construction the affirmative defenses interposed by appellant do not state a legal defense and were properly stricken; and since the payment of advance royalties was not excused, the alleged counterclaims were also properly stricken. Judgment affirmed. Costs to respondents.

McQUADE, McFADDEN, TAYLOR and SMITH, JJ., concur.