812 P.2d 253

**ALUMET, also known as, Alumet Company; Southwire Company; National Steel Corporation (Now National Intergroup, Inc.) and Earth Sciences, Inc., the partners of Alumet, Plaintiffs–Appellants–Cross Respondents,**

v.

**BEAR LAKE GRAZING COMPANY, Defendants–Respondent–Cross Appellant.**

**BEAR LAKE GRAZING COMPANY, Counterclaimant–Respondent–Cross Appellant,**

v.

**NATIONAL STEEL CORPORATION, Earth Sciences, Inc., and Southwire Company, partners doing business under the firm name of Alumet, also known as Alumet Company, Counterdefendants–Appellants–Cross Respondents.**

and

**John D. Archer and Elizabeth Archer, husband and wife, Counterdefendants–Appellants.**

**No. 18397.**

Supreme Court of Idaho,
Boise, February 1990 Term.

April 26, 1991.

Rehearing Denied July 12, 1991.

948

Moffatt, Thomas, Barrett, Rock & Fields, Boise, for plaintiff-appellant-cross respondent Alumet. Richard C. Fields argued.

Holden, Kidwell, Hahn & Crapo, Idaho Falls, for counterdefendants-appellants John and Elizabeth Archer. Curt R. Thomsen argued.

McDevitt & Meyers, Pocatello, for defendant-respondent-cross-appellant Bear Lake Grazing Co. Jerry R. Meyers argued.

BOYLE, Justice.

This petition for review arises out of the second appeal from a declaratory judgment action in the district court concerning the duty of a lessee to actively mine under an implied covenant of reasonable development on a written mining lease.

In the first appeal, *Alumet v. Bear Lake Grazing Co.*, 112 Idaho 441, 732 P.2d 679 (Ct.App.1986) (hereafter *Alumet I*), the Court of Appeals held that the lease agreement contained an implied covenant to actively mine the premises and the case was remanded to the district court to determine the level of mining required under the implied covenant. The district court was also instructed by the Court of Appeals to set a time for cure if Alumet had defaulted by failing to comply with the terms of the implied covenant.

Upon remand no additional evidence was presented by the parties and the trial court relied upon the existing record in quantifying the production required under the implied covenant at one million tons annually and set a time period for cure of the breach. All parties appealed and the case was once again assigned to the Court of Appeals. In the second appeal, *Alumet v. Bear Lake Grazing*, 119 Idaho 979, 812 P.2d 286 (1989) (hereafter *Alumet II*), the Court of Appeals affirmed the judgment of the district court and we granted review.

I.

*Facts and Prior Proceedings*

The facts are well stated in the first two appeals and will not be repeated to any great extent in this opinion except as necessary to address the issues presented. For a complete recitation of the history and facts of this litigation see *Alumet I* and *Alumet II.*

In 1964, the predecessors in interest of Alumet and Bear Lake Grazing Company entered into a lease agreement under which the lessee, Alumet, would explore and develop a phosphate mine in Caribou County near Soda Springs, Idaho. Alumet and its predecessor, Archer, extensively explored

the phosphate deposits, but did not begin removing ore until 1978. The extended primary term of the lease was to expire in May, 1979. Alumet continued to mine the property from 1978 to 1983, removing enough ore to produce royalty payments of approximately $9000.00 for that period of time. In 1984 the lessor, Bear Lake Grazing, notified Alumet that the lease was terminated due to Alumet's "failure to properly conduct good faith mining operations upon the leased premises, thereby causing an abandonment and forfeiture of said Lease." Alumet filed an action for a declaratory judgment action in district court seeking a ruling that the lease was still in effect and had not been breached.

Following a bench trial, the district court ruled that the lease contained an express covenant to develop the mine, and that the language in the lease which required the lessee to "pay royalties" for ore removed in the secondary term meant payment of "substantial royalties." The district court found that the mining levels and royalties paid to Bear Lake Grazing during the secondary term had not been substantial, and held the lease was in default. Based on calculations made in *Archer v. Mountain Fuel Supply*, 102 Idaho 852, 642 P.2d 943 (1982), the district court determined that the lessee owed $31,650.00 in royalties which were to be paid within the lease agreement's thirty-day cure period or the lease would be terminated.

Alumet and Archer appealed. The Court of Appeals reversed the trial court's determination that the lease contained an express covenant and held that the lease contained an implied covenant to actively mine. The case was remanded for a determination by the trial court of what level of mining would be required under the implied covenant and to fix a reasonable time for cure if it was found that Alumet had defaulted. Considering evidence already in the record, the district court quantified the implied covenant at one million tons production annually with a royalty payment of $250,-000.00 and allowed a one-year period to cure. Following this determination by the trial court, all parties once again appealed.

The Court of Appeals affirmed and we granted review.

## II.

### *Standard of Review*

It is well established that this Court's review of a lower court's decision is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. I.R.C.P. 52(a); *Johnson v. Edwards*, 113 Idaho 660, 747 P.2d 69 (1987); *Dalton v. South Fork of Coeur d'Alene River Sewer Dist.*, 101 Idaho 833, 623 P.2d 141 (1980); *Morris v. Fandsen*, 101 Idaho 778, 621 P.2d 394 (1980). The Idaho Rules of Civil Procedure provide: "In all actions tried upon the facts without a jury ... [f]indings of fact shall not be set aside unless clearly erroneous." I.R.C.P. 52(a). The task of weighing evidence and finding facts is within the province of the trial court and we will not set aside findings made by the trial court unless they are clearly erroneous. Further, we will give due regard to the opportunity of the trial judge to weigh conflicting testimony and to judge the credibility of witnesses. *Rueth v. State*, 103 Idaho 74, 644 P.2d 1333 (1982); *Javernick v. Smith*, 101 Idaho 104, 609 P.2d 171 (1980); *Roemer v. Green Pastures Farms, Inc.*, 97 Idaho 591, 548 P.2d 857 (1976). We must accept the trial court's findings of fact if they are supported by substantial, competent though conflicting evidence, however meager. *Rueth v. State*, 103 Idaho 74, 644 P.2d 1333 (1982); *Watkins v. Watkins*, 76 Idaho 316, 281 P.2d 1057 (1955). In *Rueth* we stated: "This standard of appellate review is salutory in effect, and reflects the view that deference must be afforded to the trial court's special opportunity to assess and weigh the credibility of the witnesses who appear before it personally." *Rueth v. State*, 103 Idaho at 77, 644 P.2d at 1336; *see also Jensen v. Bledsoe*, 100 Idaho 84, 593 P.2d 988 (1979). It follows that the conclusions of the trial court which are supported by the findings of fact will not be disturbed on appeal. *Pichon v. L.J.*

*Broekemeier, Inc.,* 108 Idaho 846, 702 P.2d 884 (Ct.App.1985).

■ In *Alumet I,* the Court of Appeals found that the lease agreement between the parties contained an implied covenant to actively mine the leased property. *Alumet v. Bear Lake Grazing Co.,* 112 Idaho 441, 732 P.2d 679 (Ct.App.1986). The time for appeal on this issue has long passed and it is, therefore, res judicata as to the implied covenant to mine in this particular case. *See Boundary County, Idaho v. Woldson,* 144 F.2d 17 (9th Cir.1944), *cert. den.,* 324 U.S. 843, 65 S.Ct. 678, 89 L.Ed. 1405 (1945). As we stated in *Insurance Assocs. Corp. v. Hansen,* 116 Idaho 948, 782 P.2d 1230 (1989):

> Accordingly, the facts having been decided, they are final, they have become the law of the case, and the Court of Appeals' pronouncement must be adhered to, both in the trial court and on subsequent appeal.

*Id.* at 116 Idaho 950–51, 782 P.2d at 1232–33; *see also Airstream, Inc. v. CIT Fin. Servs., Inc.,* 115 Idaho 569, 768 P.2d 1302 (1988); *Barker v. Fischbach & Moore, Inc.,* 110 Idaho 871, 719 P.2d 1131 (1986); *Suitts v. First Security Bank of Idaho,* 110 Idaho 15, 713 P.2d 1374 (1985). We therefore hold as the law in this case, that the lease agreement between the parties contains an implied covenant to actively mine the leased premises.

In light of the standard of review set forth above, it is our task to review the record before us to determine whether the trial court applied the correct burden of proof and whether the evidence presented supports the trial court's determination.

## III.

*Duty of Lessee Under an Implied Covenant to Develop and Mine*

■ A fundamental reason for an implied covenant is to assure that the lessor's expectations of royalties are met. *Alumet v. Bear Lake Grazing Co.,* 112 Idaho 441, 732 P.2d 679 (Ct.App.1986). Where the principal consideration to the lessor is his expectation of receiving royalties, there is

an implied obligation on the part of the lessee to diligently explore, develop, and work [mine] the premises so that the lessor may obtain the expected income that induced him to grant the lease." Annot., *Mineral Rights—Duty to Develop,* 76 A.L. R.2d 721, 725 (1961); *see also* Adams, *The Implied–In–Law Covenant to Develop and Mine in Hard Mineral Leases,* 19 Idaho L.Rev. 633, 635 (1983) (noting that "[i]t is the lessor's expectation interest which is being protected by the implied-in-law covenant to develop"). However, this does not mean that a lessee must mine solely for the benefit of the lessor, and to the detriment of the lessee. Covenants to develop should assure that both parties receive the benefit of the bargain and must be carefully applied to a lessee. *Archer v. Mountain Fuel Supply,* 102 Idaho 852, 642 P.2d 943 (1982); *see also Smith v. Long,* 40 Colo.App. 531, 578 P.2d 232 (1978). Under the prudent operator test, a lessee must continue reasonable development of leased premises to secure profits for the common advantage of both lessor and lessee. The lessee may be expected and required to do that which a prudent operator would do to develop and protect interests of both parties. However, the lessee is under no duty to undertake development which is unprofitable to him merely because its development might result in some profit to the lessor. *Rush v. King Oil Co.,* 220 Kan. 616, 556 P.2d 431 (1976). The implied obligation of a lessee to exercise reasonable diligence in development and mining may be suspended or totally terminated if the market conditions are such that development would result in a net loss to the lessee. *See* 4 *American Law of Mining,* § 131.09(5)(b) (2d ed. 1989); *Hummel v. McFadden,* 395 Pa. 543, 150 A.2d 856 (1959) (an implied covenant does not mean continuous mining). What due diligence in the mining context means will depend upon the circumstances, the quantity and quality of the mineral, the fluctuating market demand, the labor market, the accessibility of the mineral and many other factors. *Reed v. Consolidated Feldspar Corp.,* 71 S.D. 189, 23 N.W.2d 154 (1946) (a lessee who has agreed to pay lessor royalties is not re-

quired to extract ore at a loss. Unless ore can be produced at a reasonable profit, the implied obligation to work the mine is suspended). *Taylor v. Kingman Feldspar Co.*, 41 Ariz. 376, 18 P.2d 649 (1933) (while the implied covenant to develop rule requires every reasonable effort to produce and sell as much ore as possible, when there is a temporary depression in the value of the ore, such lessee is not required to extract ore at a loss merely so that the lessor may have royalties thereon). Even without an excusing clause a lessee who has agreed to pay lessor minimum royalties is not required to extract ore at a loss. *Allen v. Ruby Co.*, 87 Idaho 1, 389 P.2d 581 (1964); *Taylor v. Kingman Feldspar Co.*, 41 Ariz. 376, 18 P.2d 649 (1933); 58 C.J.S., *Mines and Minerals* § 189(b) p. 406 (1948). To determine whether a lessee has met this standard, economic, competitive and environmental factors are relevant and may be considered by the trier of fact. *Alumet v. Bear Lake Grazing Co.*, 112 Idaho at 441, 732 P.2d at 679.

■ In judging the reasonably prudent standard the courts should examine: 1) method of operation to determine if efficient planning and modern equipment were employed; 2) sales efforts conducted by the company to see if it was competing effectively with nearby mines; 3) market conditions; and 4) productivity of comparable nearby mines. *See Mendota Coal & Coke Co. v. Eastern Ry. & Lumber*, 53 F.2d 77 (9th Cir.1931). With regard to implied covenants to actively mine, the Court of Appeals, in *Alumet v. Bear Lake Grazing Co.*, 112 Idaho 441, 446, 732 P.2d 679, 684 (Ct.App.1986), accurately and correctly set forth the law as follows:

> All authorities we have found agree that when implied covenants to develop or to mine are imposed, the lessee's actions will be judged under a good faith standard—often described in terms such as reasonable diligence, due diligence, ordinary diligence or ordinary prudence. In other words, the court will compare the lessee's actions with those of a reasonably prudent, similarly situated businessman. The sufficiency of the work under the lease is determined by looking at the

specific facts and circumstances of each case. The quantity of ore removed is simply one of the factors to be considered in deciding whether the lessee's actions have been reasonable.

Alumet contends that the trial court's decision presently before us is contrary to the law established in *Archer v. Mountain Fuel*, 102 Idaho 852, 642 P.2d 943 (1982), and the majority view from other jurisdictions. Alumet cites to *Archer* wherein this Court stated:

> An obligation to mine and develop can be an onerous burden, for example when market conditions are such that development would surely result in a net loss to the lessee. Nothing prevents parties to a contract from bargaining for such an obligation, but no reason sufficient to compel us to judicially impose the obligation in the absence of an agreement has been shown.

*Id.* at 102 Idaho 856, 642 P.2d at 947.

■ Forfeitures are abhorrent to the law, and all intendments are against them. *Heisel v. Cunningham*, 94 Idaho 461, 491 P.2d 178 (1971). Where the forfeiture provision in a contract would provide an unjust and unconscionable recovery, it will not be enforced and the recovery will be assessed according to the amount of actual damage. *Blinzler v. Andrews*, 94 Idaho 215, 485 P.2d 957 (1971), *appeal after remand*, 95 Idaho 769, 519 P.2d 438 (1973).

Alumet contends that the trial court ignored the foregoing standards when it determined that a prudent operator would have invested capital for the construction of a refining operation in spite of the depressed economic conditions and uncertain market. Alumet argues that it acted prudently by not investing a great amount of capital during that time for the construction of a refining plant because the market was so uncertain and to do as ordered by the trial court would require operating at a loss. Furthermore, Alumet asserts it had invested $3.8 million on drilling, surveying, permits, environmental studies and marketing and argues that an obligation to active-

ly mine during a period of unfavorable market and economic conditions would require it to operate at a great loss, and will result in forfeiture of the mining lease and a subsequent windfall to Bear Lake Grazing which it argues is contrary to well established law. In light of our holding in part IV that the trial court misallocated the burden of proof, we agree with Alumet that the facts of the case must be considered and weighed by the trial court considering the economic market, competition and other factors required by the cited authorities.

### IV.

#### Burden of Proof

Alumet argues that the district court erred by placing the burden of proof upon Alumet to come forward with evidence showing that it did not breach the implied covenant of reasonable development. To illustrate its contention, Alumet directs our attention to the district court's Finding of Fact # 14 where it stated:

> The record of this case contains no substantial competent evidence, considering economic, environmental and competitive factors, that indicates that a prudent operator in good faith *would not* be able to mine 1 million tons of ore from the Alumet–Bear Lake leases in a mining season. (Emphasis added.)

■■■■ The general rule is that the lessor has the burden of proof to show that the lessee did not act in good faith and as a reasonably prudent, similarly situated businessmen. *See Sanders v. Birmingham*, 214 Kan. 769, 522 P.2d 959 (1974); *Durkee v. Hazan*, 452 P.2d 803 (Okla.1969). A lessor who alleges a breach of the implied covenant of further development must generally prove that the lessee has not acted with reasonable diligence under the facts and circumstances as they exist at the particular time. *See Stewart v. Amerada Hess Corp.*, 604 P.2d 854 (Okla.1979); *Sanders v. Birmingham*, 214 Kan. 769, 522 P.2d 959 (1974). The burden is likewise generally on a lessor claiming cancellation or termination of a lease to show the failure of prudent mining practices and that

increased development would result in a profit to the lessee. *Archer v. Mountain Fuel Supply*, 102 Idaho 852, 642 P.2d 943 (1982); *Atlantic Richfield Co. v. Gruy*, 720 S.W.2d 121 (Tex.1986); *Anderson v. Meuer*, 50 Cal.App.2d 841, 123 P.2d 903 (1942). "A lessor who alleges breach of an implied covenant to develop has the burden of showing by substantial evidence that the covenant has been breached." *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 785 P.2d 1010, 1015 (1990); *Sanders v. Birmingham*, 214 Kan. 769, 522 P.2d 959 (1974). It has been held that such a claim, by its very nature, must be supported by expert testimony. *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 785 P.2d 1010, 1015 (1990).

■■■■ The fact that Alumet initiated this legal action in the form of a declaratory judgment action does not alter the procedural and evidentiary burden. The burden of proof in a declaratory relief action is governed by the same rules and considerations as are applicable to the same problem when it arises in legal proceedings of other types. *Annot.* 23 A.L.R.2d at 1250; *Hall v. Eversole's Adm.*, 251 Ky. 296, 64 S.W.2d 891 (1933) (in suit under Declaratory Judgment Act where *defendants'* asserted right to partial *cancellation* of oral lease, *burden of proof was upon them*).

The Court of Appeals in *Alumet II* correctly stated the burden of proof applicable to a mining lease.

> In an action where a mining lessee's failure to develop the property is raised as claim or defense, and the lessee's performance under the lease is tested according to the standard of reasonable diligence, the lessor must allege and prove that the lessee has failed to meet that standard.

119 Idaho at p. 985, 812 P.2d at p. 292.

Although the Court of Appeals correctly stated the law in this regard, proper application would require the lessors to prove that Alumet has failed to comply with the implied covenant to develop and mine the leased premises.

The trial court's findings regarding the burden of proof and the use of the words "would not" have been the subject of significant debate between the parties in this appeal. Alumet argues that the trial court clearly misapplied the burden of proof and placed upon it, as the lessee, the burden to prove that it did not breach the implied covenant of reasonable development. On the other hand, Bear Lake argues that the choice of the words "would not" is merely semantics and a reading of the trial court's entire decision clearly reveals that the proper burden of proof was applied.

The Court of Appeals described the use of the phrase "would not" in Finding 14 as "unfortunate lapses into double negative phraseology," 119 Idaho at p. 985, 812 P.2d at p. 292, but concluded that a reading of the trial court's decision in its entirety left them unpersuaded that the trial court misunderstood the burden of proof. Further, the Court of Appeals noted that "[S]tatements substantially similar to those quoted here, but expressed in positive terms free of double negatives, can be found in the judge's decision." At p. 986, 812 P.2d at p. 293.

Our review of the record does not reveal any evidence of what a similarly situated reasonably prudent operator would do under the circumstances.[1] There is no evidence to support a one million ton annual production requirement other than inferences drawn from projections of what Alumet had anticipated producing at a time predating the economic problems experienced in the phosphate industry. Although misapplication of the burden of proof does not invariably result in prejudice, *Alumet II*, at p. 986, 812 P.2d at p. 293, the use of the words "would not" appears to place the burden of proof of an annual production requirement on Alumet. This is contrary to well-established law in this jurisdiction, *Alumet II; Archer v. Mountain Fuel Supply*, 102 Idaho 852, 642 P.2d 943 (1982), and to the majority view held by other jurisdictions.

In *Archer v. Mountain Fuel Supply*, a unanimous Court observed:

> An obligation to mine and develop can be an onerous burden, for example when market conditions are such that development would surely result in a net loss to the lessee. Nothing prevents parties to a contract from bargaining for such an obligation, but no reason sufficient to compel us to judicially impose the obligation in the absence of an agreement has been shown.

102 Idaho at 856, 642 P.2d at 947. By way of footnote, the Supreme Court added:

> We note that imposing such an obligation in this case might result in a forfeiture of the leases by Beker and Mountain Fuel and consequent windfall to the Archers, who have received $183,000 without having any of the ore available under the leases depleted.

*Id.* at 102 Idaho 856, n. 5, 642 P.2d at 947, n. 5.

The onerous burden to mine and develop when market and economic conditions are not favorable resulting in a windfall or forfeiture as noted by the Court in *Archer v. Mountain Fuel Supply*, is the precise result reached in this case if the trial court's decision is affirmed. Likewise, the Court of Appeals' decision in *Alumet II* which requires a lessee to mine at a loss unless the lease provisions or a contract relieve that duty is contrary to the direction provided by this Court in *Archer v. Mountain Fuel Supply*, 102 Idaho 852, 642 P.2d 943 (1982).

---

1. The district court's Finding of Fact # 13 states: "Other companies in southeastern Idaho and the western United States have invested substantial capital as they mined phosphate ore on a commercial basis from 1974 to 1984." However, 1974 to 1984 is not the relevant period. The relevant period does not date clear back to 1974. Rather, the relevant period is from 1980, when Alumet acquired the land upon which to build a processing plant, and 1984 when Bear Lake sought to terminate the lease. Furthermore, the evidence cited by the trial court as support for this finding of fact does not demonstrate that other companies had invested large amounts of capital during the relevant period. The evidence cited by the trial court only demonstrates that there were several pre-existing mines and processing plants operating during this period. In our review of the record we found no substantial competent evidence to support a finding that these companies were investing large amounts of capital during this period.

**954**

Our review and scrutiny of the record leaves us concerned that the trial court required Alumet to carry the burden to prove that it, as a reasonable prudent mine operator, would *not* be able to mine one million tons of ore from the leased premises during a mining season. Considering that the law abhors a forfeiture and that all intendments are against a forfeiture, *Heisel v. Cunningham*, 94 Idaho 461, 491 P.2d 178 (1971), and that due diligence under an implied covenant to develop and mine leased property requires a reasonable application so that economic and market conditions are considered to prevent substantial financial loss to the lessee, 4 *American Law of Mining*, § 131.09(5)(b) (2d ed.1989), and particularly considering that the lessor is required to prove a breach, we hereby reverse the decision of the trial court and hold that an implied obligation of a lessee to exercise reasonable diligence in development and mining may be suspended, or totally terminated, if the market and economic conditions are such that development would result in a net loss to the lessee. Obviously, the suspension of mining activities would be temporary and the implied covenant to mine and develop would require good faith, prompt reasonable compliance once the economic and market conditions changed and were such that mining would not be operated at a financial loss or economic hardship to the lessee. Once the market conditions or temporary economic conditions beyond the control of the lessee change, then the lessee would have the duty and responsibility to immediately resume mining and development operations under the implied covenant to mine. All of these factors may be considered by the trial court in determining whether Alumet is in breach of its covenant to mine.

Following remand in *Alumet I*, it is unfortunate that the parties did not accept the trial court's invitation to submit additional evidence. If additional evidence had been submitted it is likely that the trial court would not have been required to phrase Finding # 14 in the "would not" language that the Court of Appeals referred to as "... unfortunate lapses into double negative phraseology." At 119 Idaho at 986, 812 P.2d at p. 293. Regardless of how we categorize these two words it is obvious that any one of several interpretations can be applied with varying results. In a case that could eventually require the forfeiture of millions of dollars of investment, and a potential windfall to the lessor, we conclude that it is necessary for the case to be remanded for a determination by the trial court of the level of mining required to satisfy the implied covenant based on the evidence with the burden of proof allocated to the lessor.

### V.

### *Time for Cure*

Bear Lake asserts that the one year time for cure of default allowed by the trial court was excessive. We disagree. Considering that the record demonstrates one million tons of ore is nearly one-sixth or sixteen percent of the total production of phosphate in the western United States, we cannot find error in the trial court allowing a one-year period to produce such a substantial amount. Accordingly, based upon the record as it presently exists, we find no error in the one-year time for cure and affirm the trial court in this regard.

In light of our holding that the trial court erred in misallocating the burden of proof and remanding for further proceedings, it is not necessary that we address the other issues raised and argued on appeal.

Therefore, the judgment of the district court is reversed and remanded for further proceedings and to enter findings based on the evidence in the record, or upon request of any of the parties to submit further testimony or evidence, with the burden of proof properly allocated upon the lessor Bear Lake Grazing to prove that the lessee Alumet breached its implied covenant to develop and mine the leased property.

The judgment of the district court as to the time for cure being one year is affirmed as being reasonable under all the circumstances presented.

Costs to appellant Alumet. No attorney fees allowed.

BAKES, C.J., concurs.

BISTLINE, Justice, concurring in the result reached in the opinion authored by BOYLE, Justice, and specifically concurs in Parts III, IV, and V.

## I.

The doctrine of law of the case has long been a rule in Idaho. *Suitts v. First Security Bank of Idaho,* 110 Idaho 15, 713 P.2d 1374 (1985), citing *inter alia, Richard v. Jarvis,* 44 Idaho 403, 258 P. 370 (1927), and *Creem v. Northwestern Mutual Fire Association,* 58 Idaho 349, 74 P.2d 702 (1938). In the *Suitts* 1985 opinion this Court stated unequivocally that this Court's opinion in the prior 1979 case between the same plaintiff and the same defendant represented the law of the case and on the remand was binding upon the trial court.

In *Richards v. Jarvis,* this Court stated: "The conclusions of this court upon the first appeal established the law of the case for the guidance of the trial court and should have been followed." 44 Idaho 403, 406, 258 P. 370, 370 (1927). In the *Creem* case this Court said, responsive to a contention that the trial court in proceedings following remand had not followed this Court's prior decision, that the appellant so asserting was in error. *Creem,* 58 Idaho at 351, 74 P.2d at 702. Justice Ailshie joined by Chief Justice Sullivan in *Hall v. Blackman,* 9 Idaho 555, 75 P. 608 (1904), observed as to a doctrine that the ruling or holding on a point of law is available as authority in other cases to be followed and thus affirmed or to be modified or overruled according to its intrinsic merits, but in the very case in which a ruling or holding is made it is binding in all further proceedings. *Hall v. Blackman,* 9 Idaho 555, 75 P. 608. It is thus established that law of the case is firmly entrenched in Idaho jurisprudence, and has been since almost immediately following statehood.

## II.

It has been suggested that this Court, in the instant case and under the attendant circumstances is somehow bound by the law of the case doctrine, as to what the Court of Appeals wrote in *Alumet I,* and then *Alumet II.*[2] However, pursuit of that notion seemingly has not been renewed. Moreover, this Court, responding to appellants' petition for review of *Alumet II,* supported by briefs, granted review, and the same issues which were passed on by the Court of Appeals are now squarely before us. It has been well established that when review has been granted, this Court turns directly to the decision of the trial court and examines proceedings in that court as relative to claimed error, nevertheless remaining cognizant of the views and rulings of the Court of Appeals. When our review is concluded and should we reach a decision contrary to that reached by the Court of Appeals, the opinion announcing this Court's decision is the ultimate and final termination of the case.[3] The decision and opinion of the Court of Appeals at that point becomes *functus officio,* other than that this Court may have repeated and relied upon excerpts contained therein. Hopefully the remarks which I have proffered will make it clear that conclusions reached by the Court of Appeals, although binding on the district courts as law of the case, do not and cannot in any manner preclude this Court from reaching its own conclusions.

## III.

When we were presented with Alumet's request that we grant review of the *Alumet II* opinion of the Court of Appeals, in

2. *Alumet v. Bear Lake Grazing Co.,* 112 Idaho 441, 732 P.2d 679 (Ct.App.1986) (*Alumet I*); *Alumet v. Bear Lake Grazing Co.,* 119 Idaho 979, 812 P.2d 286 (Ct.App.1989) (*Alumet II*). A prior case, *Archer v. Mountain Fuel Supply Co.,* 102 Idaho 852, 642 P.2d 943 (1982), involved the same property, but not the same parties nor the same trial judge.

3. Keeping in mind, of course, that the time in which to petition for rehearing has expired without rehearing being sought.

order to cast an informed vote, it was necessary to undertake a considerable review of the prior proceedings, and certainly not out of order to review this Court's decision in the *Archer* case, 102 Idaho 852, 642 P.2d 943. In *Archer* the primary issue which was decided revolved around the Archer contention that his lessee, Mountain Fuel Supply, and its codefendant, Beker Industries Corporation, a Delaware corporation, were by the terms of an executed agreement, and in particular the royalty provisions thereof [paragraph 4] expressly required to mine and develop the leasehold property, if not expressly, then impliedly. *Archer*, 102 Idaho at 853–54, 642 P.2d at 944–45. The district court, Judge Rasmussen, had held for the codefendants, and against Archer. A unanimous Supreme Court affirmed, pointing out that:

> An example of language expressly obligating a party to produce from leased property is found in Section 2(d) of the underlying Dry Valley Lease between the Archers and the Department of the Interior, which provides
>
> Sec. 2. In consideration of the foregoing, the lessee hereby agrees:
>
> ....
>
> (d) *Minimum production.* To prospect diligently the leased lands and beginning with the fourth year of the lease, except when operations are interrupted by strikes, the elements, or casualties not attributable to the lessee, or unless operations are suspended as provided in section 39 of the act, to mine each year the leased deposits and pay a royalty thereon to a value of $1 an acre or fraction thereof. The lessee may, at any time prior to the end of the thirtieth month of this lease, file a petition with the Mining Supervisor to have the minimum production specified herein changed to a lesser figure, supporting such petition by the required showing and if the lessor finds that the facts warrant such action, he will change the requirement to a lesser figure.
>
> An identical provision appears in the Wallentine Ranch lease which was ultimately issued to Mountain Fuel. Since the Archers were lessees under the original lease, it is manifestly evident that they were aware that language expressly obligating lessees to mine could have been included in the lease with Mountain Fuel. We draw no inferences from the absence of such language in the Archer/Mountain Fuel agreement. We simply note that it is not present.

*Archer*, 102 Idaho at 854–55, 642 P.2d at 945–46 (emphasis in original) (footnote omitted). In holding that the 1962 agreement contained no express provision obligating the lessees to mine, our opinion noted:

> There is no language in paragraph 4 that could possibly be construed as such a covenant. While the paragraph does address royalties for ore mined, and it would be useless to discuss royalties unless the parties contemplated mining the property—indeed, the sole purpose of the lease was to allow Mountain Fuel to mine the property—there is a tremendous difference between assigning the *right* to mine certain property, subject to a condition that royalties be paid, and imposing an *obligation* to mine property.

*Archer*, 102 Idaho at 855, 642 P.2d at 946 (emphasis in original). As to an Archer contention that a court had "imposed an implied-in-law obligation to mine, separate and apart from the language of an agreement, where substantial consideration was paid in exchange for a mining lease" we were not persuaded, noting that "[a]n obligation to mine and develop can be an onerous burden, for example when market conditions are such that development would surely result in a net loss to the lessee." *Archer*, 102 Idaho at 856, 642 P.2d at 947.

IV.

It is without question that this Supreme Court is the court of last resort, insofar as the doctrine of law of the case is concerned. That being so, I am unable to accept Justice Boyle's quotation of a passage from *Insurance Associates Corp. v. Hansen*, 116 Idaho 948, 950, 782 P.2d 1230, 1232 (1989): "Accordingly, the facts having been decided, they are final, they have be-

come the law of the case, and the Court of Appeals' pronouncement must be adhered to, both in the trial court and on subsequent appeal." At 119 Idaho 979, 812 P.2d 286 (1991). That statement made by Justice Bakes, would be generally correct *if* we were considering the principle of *res judicata,* which we most assuredly are not doing. But more than that, the language of the preceding sentences in the paragraph necessarily have to be considered. It was not that the "facts had been decided" which was erroneously treated as law of the case, and which would be *res judicata* and not at all be law of the case, but what did involve law of the case was that "the Court of Appeals expressly '*concluded* that the findings of fact made by the district court are supported by the evidence, are not clearly erroneous, and, should not be set aside.'" *Insurance Associates,* 116 Idaho at 950, 782 P.2d at 1232 (emphasis added).

As is readily noted in Justice Boyle's opinion, at 119 Idaho at 955, 812 P.2d at 262, he speaks both of *res judicata* and law of the case interchangeably in discussing the implied covenant to mine:

The time for appeal on this issue has long passed and it is, therefore, *res judicata* as to the implied covenant to mine in this particular case. *See Boundary County, Idaho v. Woldson,* 144 F.2d 17 (1944), *cert. den.,* 324 U.S. 843 [65 S.Ct. 678, 89 L.Ed. 1405] (1945).

. . . .

We therefore hold as the law [of the case] in this case, that the lease agreement between the parties contains an implied covenant to actively mine the leased premises.

Additionally, Justice Boyle seemingly feels the need to bolster the *Insurance Associates* quotation by stating: "*[S]ee also Airstream, Inc. v. CIT Fin. Servs., Inc.,* 115 Idaho 569, 768 P.2d 1302 (1988); *Barker v. Fischbach & Moore, Inc.,* 110 Idaho 871, 719 P.2d 1131 (1986) [*Matter of Barker*]; *Suitts v. First Security Bank of Idaho,* 110 Idaho 15, 713 P.2d 1374 (1985)." Those cases were indeed Idaho authority on law of the case doctrine. Both *Airstream* and

*Suitts* were authored by me, and in *Barker,* I authored a concurring and dissenting opinion, portions of which are hereinafter displayed while law of the case is presently center stage:

I know of no principle of law which absolutely prohibits this Court—any appellate court—from rectifying its own error—especially when a just respect for a court's duty to attempt the achievement of justice has been activated.

I concede that the doctrine of law of the case has been recognized in Idaho as in other jurisdictions. In *Neilsen and Co. v. Cassia and Twin Falls County Joint Class A School District,* 103 Idaho 317, 647 P.2d 773 (1982), the Court of Appeals recognized that it could not review a finding of the *Supreme Court* on a prior appeal in the same case. A general proposition of law is that an inferior court is ordinarily bound by a higher court's determination, with some few exceptions. 5 Am.Jur.2d *Appeal and Error* § 744.

However stringently the law of the case doctrine may bind inferior courts, it is a different matter where the question comes up in the same appellate court. That doctrine, however, is not binding on appellate courts which on a second appeal perceive that their prior appellate decision was in error. The Arizona Supreme Court, after recognizing that the doctrine was well-established in that state, went on to say:

While some courts insist that the doctrine should be applied at all times, 3 Am.Jur. 547, others create an exception where it appears the former decision was palpably erroneous. An abundance of authority from many jurisdictions sustains this latter principle. For example the Supreme Court of California sixteen years ago rejected the doctrine that the law of the case absolutely precluded reexamination of a manifestly unjust decision.

' * * * The doctrine of the law of the case is recognized as a harsh one (2 Cal.Jur. 947) and the modern view is that it should not be adhered to when the application of it results in a mani-

festly unjust decision. *United Dredging Co. v. Industrial Acc. Comm.*, 208 Cal. 705, 284 P.2d [P.] 922. ...'

. . . .

We are of the opinion that a ruling on one appeal if manifestly or palpably erroneous is not to be treated as conclusive on subsequent appeal of the same case. We are of this view because courts exist but for the ultimate purpose of establishing justice. If we adhere rigidly to an arbitrary principle of convenience and declare as our decision that which is clearly wrong and which we know to be wrong, then we are defeating the purpose for which courts exist. Moreover, we are in effect saying that it is of no consequence to us that justice had not in the end prevailed. *Sibley v. Jeffreys*, 81 Ariz. 272, 305 P.2d 427, 429–30 (1956).

As summarized in 5 Am.Jur. *Appeal and Error*, § 750:

. . . .

However, *since the doctrine of the law of the case is merely one of practice or court policy,* and not of inflexible law, so that appellate courts are not absolutely bound thereby, but may exercise a certain degree of discretion in applying it, there are many holdings in which the courts have retreated from any inflexible rule requiring the doctrine to be applied regardless of error in the former decision, and *it has been said that the doctrine should not be utilized to accomplish an obvious injustice, or applied where the former appellate decision was clearly, palpably, or manifestly erroneous or unjust.* (Footnotes omitted) (emphasis added).

The Montana Supreme Court has put in thusly: '[T]he evils of adherence to the rule are sometimes greater than those of a departure from it.' *State v. Hale*, 129 Mont. 449, 291 P.2d 229 (1955). The Supreme Court of New Mexico wrote that an appellate court 'should apply the law of the land rather than the law of the case. *Farmer's State Bank v. Clayton*

*National Bank*, 31 N.M. 344, 245 P. 543 (1925).

*Matter of Barker*, 110 Idaho 871, 873–74, 719 P.2d 1131, 1133–34 (1986) (footnote omitted, emphasis in original).

Law of the case, however, while similar, is broader in scope than *res judicata.* More importantly, that which may properly be seen as barred by *res judicata,* is not so barred when the involved principle is law of the case, especially where this, the highest appellate court is ultimately involved and bears the burden of coming down with the final conclusion, and hopefully the correct one. A law of the case announcement from this Court will be binding in any further proceedings in all of the lower courts; however, a law of the case announcement from the Court of Appeals, while it will be binding on the district courts, does not at all fetter this Court's authority to intervene and rule otherwise should it see fit to do so.

Justice Boyle has written that: "We therefore *hold* as the law [of the case] in this case, that the lease agreement between the parties contains an implied covenant to actively mine the leased premises." Dealing with that declaration, solely to address a matter of proper nomenclature, it is the *conclusion* of a court which becomes the law of the case. Moreover, that the Court of Appeals has heretofore announced the law of the case is true, but with binding effect only insofar as courts inferior to it are concerned. It is because they are inferior courts that they must follow the law of the case as it has been declared by either of the appellate courts, meaning this Court or the Court of Appeals.

Accordingly, I do not agree with, or concur in Justice Boyle's opinion as to that one particular point. The Court of Appeals, on becoming involved, probably did have the authority to impress onto the lease agreement of the parties an implied covenant to actively mine the leased premises. In doing so, however, it may have been usurping the function of the trial court. It did restrict the district court to making the determination of Alumet's mining obligations as to how much and how soon.

However, it is at the bargaining stage of a lease agreement that all covenants should be agreed upon and spelled out with specificity. Leslie Dana Pech, in the summary of her law review article, *Agreement Clauses We Wish We Had (Or Didn't Have)*, 29 Rocky Mountain L.Inst. 241, cautioned as much:

The past few years have provided many events which the mining industry would have thought impossible and the future will bring new, unexpected events. What we have experienced recently should not be forgotten when the 'present' is again on the upswing. All mining agreements, like any other contract or document, should be drafted carefully, precisely, and with a knowledge of the mineral commodities sought and the specific property position. All agreements should anticipate and provide for the occurrence of negative events. When difficult times occur, it is often too late or impossible to renegotiate or restructure an agreement. The penalties to the lessee company can be, and often are, serious.

Where the parties failed to draft and execute an agreement which dealt fully with all of the probabilities as to what might come to pass, it is not readily understood how or why it is that the courts of Idaho should rewrite the agreement which the parties had entered into. Such is and forever has been the function of attorneys, and a function undertaken and concluded *before* the parties find themselves involved in costly litigation because of neglecting to ascertain that all of the bases had not been covered.

The history of this continuing litigation was well set out by Judge Walters in authoring the Court of Appeals first decision in *Alumet I.* That decision "concluded that the district court erred in determining that the lease contained an *express* covenant to develop." 112 Idaho at 445, 732 P.2d at 683. In ruling that there was no expressly stated covenant to develop, it

went on to add that missing from the lease were any provisions which detailed or even mentioned any promises (covenants, guarantees) that "development will proceed through certain stages within specified times, or that, alternatively that specified sums will be expended during each period for exploration." 112 Idaho at 445, 732 P.2d at 683.

The Court of Appeals, although it held the district court erred in finding an express covenant, proceeded to declare its belief "that the district court's analysis reflected the obvious conclusion that development of a mine was contemplated by the parties, ... and that an ongoing mining operation was contemplated by the parties." 112 Idaho at 445, 732 P.2d at 683. Just as all that glitters is not gold, all that is "contemplated" does not rise to the status of contractual covenants. Seemingly, it would go without saying that where two or more parties have entered into a written lease agreement of a property which one of the parties possessed under a Department of Interior lease, it would be highly unusual if the lease agreement was not entered into in the pursuit of a supposedly profitable venture for all concerned.

The Court of Appeals in *Alumet I* turned to the Pech law review article[4] for the factors to be included when fashioning a lessee's implied covenant to actively mine. 112 Idaho at 445, 732 P.2d at 683. Following which after further discussion it *directed the district court on remand to recognize an implied covenant to mine under the lease*—not just as a general principle of law, but meaning *the* particular *lease agreement* which the parties had executed.

It is primarily on the foregoing basis that at first blush I questioned the authority of the Court of Appeals to direct how the lease agreement should be judicially modified, and simultaneously mandate that the district court follow its directions as to how proceedings on remand should be conducted. The parties are all bound by the terms of the negotiated lease agreement to which

---

4. Leslie Dana Pech, Agreement Clauses We Wish We had (or Didn't Have), 29 Rocky Mountain L.Inst. 241.

they affixed their signature, and it should be so held. Courts should be indeed loathe to add judicial embellishment. The error on the part of the Court of Appeals should not too readily be overlooked. Its directions to the trial court, Judge Woodland, appear to have been the proximate cause of the controversy which is still ongoing.

In closing, I suggest that one major factor which has eluded discussion is the specially concurring opinion which Judge Burnett issued in *Alumet II* on denial of rehearing where he delved into the lack of a habendum clause in the mining lease agreement. There is a wealth of material contained in that opinion, but apparently it has gone unnoticed by the litigants.

JOHNSON, Justice, concurring and dissenting.

I concur in the majority opinion, except the portion which holds that the trial court misallocated the burden of proof and the portion that remands for further proceedings to determine the level of mining required to satisfy the implied covenant. In my view, there is ample evidence in the trial court's decision that the trial court understood and correctly allocated the burden of proof. The trial court's findings of fact support the imposition of the one million tons requirement.

The trial court's conclusions of law stated, in part:

D. Under the circumstances of this case, considering the length of the primary term of the lease, the expectation of the parties, the economic, environmental and competitive factors, a prudent operator in good faith would not have mined as the secondary term began and continued only for the purpose of keeping the lease alive.

E. A prudent operator in good faith, under the conditions and factors referred to above, would mine at least 1 million tons of ore annually.

These conclusions make it plain to me that the trial court did not rule against Alumet because Alumet did not fulfill a burden of proof. These conclusions clearly indicate that the trial court considered all the evidence and was persuaded that Alumet had not acted with reasonable diligence under the facts and circumstances as they existed at the times involved.

The trial court's findings in support of the one million tons requirement stated:

FINDINGS OF FACT

1. Drilling and trenching operations were performed by lessee on the property between 1965 and 1974 to determine the location, grade of ore and thickness of deposit.

2. Substantial ore, good for commercial development, was located on the leased property.

3. Alumet shortly after it obtained the property by assignment from John Archer, devised a plan and schedule for mining and processing ore. That plan called for construction of a beneficiating and calcining plant and annual production of approximately 2.5 million tons of ore. (Plaintiff's Exhibit 12 and Defendant's Exhibit "E")

4. Calcining and beneficiating phosphate ore are necessary to a market and a viable phosphate mining operation in the upper intermountain area. Such a plant was contemplated by the parties and known at the time of the extension of the primary term and of the assignment of the lease by Archer to Alumet. (Tr. Vol. IV, P. 659–60, 1. 8–1)

5. At a September 1976 meeting, Alumet declared its intention to build a processing plant and to process 1 to 1.5 million tons of ore annually. (Tr. Vol. I, P. 124, 125, 1. 23–4, Defendant's Exhibit "C")

6. Alumet represented in January 1980 that 1) construction of the processing plant would begin immediately; 2) the needed capital to finance plant construction had been obtained; 3) increased mining would begin so a stock pile would be available on completion of plant construction. (Tr. Vol. III, P. 430, 1. 3–12; P. 431–435)

7. Davy Power Gas Company was contracted by Alumet for the purpose of

independent verification of the existence of commercial ore bodies on the leased property so $130 million could be borrowed to build the contemplated plant and roads. (Tr. Vol. I, P. 113–114, 1. 24–11)

8. There are at least 21.1 million tons of proven minable ore on the Diamond & Lanes Creek sites covered by the lease. (Tr. Vol. I, P. 141, 142, 1. 14–2; Plaintiff's Exhibits 30 & 36)

9. Alumet never did capitalize its operation sufficiently to build the processing plant or transportation facilities, to commercially mine the leased property. (Tr. Vol. I, P. 116–125; Defendant's Exhibit "C")

10. Alumet began mining in 1979 at the end of the primary term and until this action was instituted for the purpose of preventing termination of the lease only. (Tr. Vol. II, P. 288, 1. 11–17)

11. In mining only to keep the lease alive, Alumet is not making a profit. (Tr. Vol. II, P. 287–288, 1. 22–10)

12. Alumet is essentially an unfunded partnership whose operation since 1979 is limited by a budget equal to pre-sold raw ore. (Tr. Vol. I, P. 116–125; Vol. II, P. 182–183)

13. Other companies in southeastern Idaho and the western United States have invested substantial capital as they mined phosphate ore on a commercial basis from 1974 to 1984. (Exhibit 66, Tr. Vol. II, P. 215–221)

I would affirm the decision of the trial court.

McDEVITT, J., concurs.

McDEVITT, Justice, dissenting:

I am unable to subscribe to the majority opinion reversing the trial court.

Upon remand to the trial court from the initial appeal, that court entered a Memorandum Decision and Comprehensive Findings of Fact and Conclusions of Law.

In the ten pages of detailed analysis, thoughtful evaluation, and legal reasoning of the trial judge, the majority has found a single grammatical usage which it finds objectionable. The majority concludes that this one deviation from what it considers to be approved English, demonstrates that the trial judge did not place the burden of proof on the proper party. There is SUBSTANTIAL EVIDENCE in the record before the court to support the conclusions of the trial court however it may be described or characterized. The "substantial evidence" test is now replaced by the majorities Syntax review, a moving target at best.

The majority seems motivated by the argument that the trial court's result would provide the lessor with a substantial "windfall." There is evidence that the lessee did spend substantial sums on "drilling, surveying, permits, environmental studies and marketing." How these acts, all undertaken by lessee for the benefit of the lessee which remain the property of the lessee and which would have to be done anew by any subsequent lessee, constitute a "windfall" to the lessor escapes me.